594 A.2d 1142

**MARYLAND PENNYSAVER GROUP, INC.**

v.

**COMPTROLLER OF THE TREASURY.**

No. 120, Sept. Term, 1990.

Court of Appeals of Maryland.

Sept. 10, 1991.

Evelyn W. Pasquier (Shale D. Stiller, Frank, Bernstein, Conaway & Goldman, on brief), Baltimore, for petitioner.

Gaylin Soponis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Deborah B. Bacharach, Sheldon H. Laskin, Asst. Attys. Gen., on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and MARVIN H. SMITH, Judge of the Court of Appeals (retired, specially assigned), JJ.

RODOWSKY, Judge.

This is a sales tax refund case. The taxpayer, Maryland Pennysaver Group, Inc. (MPG), publishes opuscules of a type known as shoppers' guides, or shopping advertisers, or pennysavers. MPG claims the statutory exemption for newspapers and that, if excluded from the exemption, its rights under the first and fourteenth amendments of the United States Constitution would be violated. We reject these contentions for the reasons set forth below.

MPG began publishing pennysavers in Maryland during the summer of 1979. There were then no similar publications in Maryland. Businesses pay MPG to place commercial ads in a pennysaver, and individuals pay MPG to place classified ads in a pennysaver. Pennysavers are published weekly for specific areas.[1] Pennysavers are mailed to every resident and business in the particular edition's spe-

---

1. For example, on May 18, 1983, separate pennysaver editions were published for Annapolis/Crownsville, Cape St. Claire/St. Margarets, Severna Park/Arnold, Millersville/Severn, South [Anne Arundel] County, Pasadena/Gibson Island, Glen Burnie East, Glen Burnie West/Linthicum, Bowie/Crofton, and Kent Island/Grasonville.

cific area, without charge to the recipient. There is no newsstand distribution.

MPG pennysavers are printed on newsprint in quarterfold format, as distinguished from a tabloid or broadsheet. The pages measure $7\frac{3}{8}$ inches by $10\frac{3}{4}$ inches, and they are stitched or glued along the fold. Prior to April 1985 MPG used an outside printer to print pennysavers, and thereafter, MPG has printed in house. The sales tax assessment involved in the instant litigation covers the period December 1, 1982, through November 30, 1986. It includes tax on the cost to MPG of outside printing and tax on the cost to MPG of newsprint and ink for in-house printing.

Copies of four separate pennysavers are included in the record extract as illustrative of pennysavers published during the period covered by the tax assessment. One is the Kent Island/Grasonville Pennysaver for the week of May 18, 1983. The masthead occupies approximately twenty percent of the page at the top, while the balance of that page is an ad for a sports clothing store. The edition consists of fifty-six pages, unnumbered. With the exception of four and one-half pages, the publication is entirely ads, ranging from full page ads to two or three line classified ads. The twenty-sixth and forty-fourth pages are headed "Community News," and the fifty-second page has one column (a half-page) headed "Community News." "Community News" consists primarily of announcements of activities, such as meetings, fundraisers, and social events, to be held by various church, civic, and other community organizations. Each of two pages of the edition contains a chapter of a serialized Western novel. The reader is advised that the book is available in hardcover edition from MPG.

The four illustrative pennysavers reproduced in the record extract total 249 pages. Within that total there are three half-pages consisting of columns written respectively by the Mayor of Annapolis (on national building safety week), by a member of the Maryland House of Delegates (interviewing an Anne Arundel County police officer con-

cerning crime prevention), and by the County Executive of Anne Arundel County (on preserving the Chesapeake Bay).

The retail sales tax is imposed "[f]or the privilege of selling certain tangible personal property at retail ... and for the privilege of dispensing certain selected services defined as sales at retail by § 324(f). . . ." Maryland Code (1957, 1980 Repl. Vol.), Art. 81, § 325(a).[2] During the assessment period, and currently, the tax rate is five percent beginning where the sales price is $.20. § 325(a)(1). For sales tax purposes "the term 'sale at retail' includes ... [a]ny ... printing of tangible personal property on special order for a consideration." § 324(f)(2). MPG had not paid sales tax on the outside printing of its pennysavers. Nor had it paid sales tax on its ink and paper purchases for in-house printing.[3]

MPG paid the tax and interest assessed by the Comptroller, obtained a waiver of penalty, and sought a refund. MPG claimed exemption under § 326(n). It provides exemption for

"[s]ales of transportation services, and the printing and sales of newspapers of any and all types, and the sales of any photographic materials used in the composition and printing of newspapers."

The term "newspaper" is not defined in the statutes. Regulations of the Comptroller set forth standards for determining whether a publication is a newspaper. *See* Md.

**2.** Because we deal with sales tax and with an assessment period of 1982–1986, all Code citations, unless otherwise stated, are to Maryland Code (1957, 1980 Repl. Vol.) and to Art. 81.

As part of the ongoing Code Revision project, the statutes relating to the sales and use taxes were recodified as part of Md.Code (1988), Tax–General Article, effective January 1, 1989.

**3.** MPG has abandoned an argument that its purchases of paper and ink were not sales at retail. The argument was based on § 324(f)(iii) which excludes from sales at retail transactions in which the purpose of the purchaser is "to use or incorporate the property so transferred as a material or part of other tangible personal property to be produced for sale by manufacturing, assembling, processing or refining." Pennysavers are not sold.

Regs.Code (COMAR), Title 3, § 06.01.05 (1990). This regulation specifically excludes a "shopping advertiser" from "newspapers." Applying the regulation, the Comptroller denied the refund.

MPG appealed to the Maryland Tax Court. Its petition, to the extent here relevant, averred that the Comptroller had erred because pennysavers were entitled to the § 326(n) exemption for newspapers, and because Regulation .05, both facially and as applied by the Comptroller, violated MPG's rights under the first and fourteenth amendments of the United States Constitution. The Tax Court held that MPG's pennysavers were not newspapers of any type intended to be embraced within § 326(n), that Regulation .05 was valid, and that the pennysavers were "shopping advertisers," excluded from the exemption. Nor was there any constitutional violation, in the Tax Court's opinion, because MPG's publications were "not within the class (newspaper)" with which MPG sought to have its publications associated.

The Circuit Court for Anne Arundel County, on MPG's appeal, affirmed the Maryland Tax Court. MPG appealed to the Court of Special Appeals. Before consideration of the matter by that court we granted MPG's petition for certiorari. It raises two questions, the presentation of which we reorder below.

"[1] Do the Sales Tax Regulations improperly limit the scope of the statutory exemption from sales tax for 'the printing and sales of newspapers of any and all types'?

"[2] Does the Comptroller's refusal to allow the Pennysaver an exemption granted by statute for 'the printing and sales of newspapers of any and all types' violate the Petitioner's fundamental rights of free speech under the First and Fourteenth Amendments of the United States Constitution?"

I

The Tax Court's conclusion that MPG's pennysavers are shopping advertisers is well supported by the record,

and MPG does not attack that factual finding implicit in the Tax Court's holding. Rather, MPG's argument is that Regulation .05's exclusion of shopping advertisers from the newspaper exemption violates § 326(n) which exempts newspapers "of any and all types." The evolution of the regulation and of the exemption statute, and the regulation's status as a legislative rule, negate MPG's argument.

The Maryland Retail Sales Tax and Use Tax Acts were first enacted by Chapters 281 and 681 of the Acts of 1947, and codified as Md.Code (1939, 1947 Cum.Supp.), Art. 81, §§ 259–307 and §§ 308–336. The 1947 enactment contained no exemption for the printing or sale of newspapers, and did not define that term.[4]

The original sales tax statute "authorized and empowered" the Comptroller, "[i]n addition to the powers granted to the Comptroller" in the sales tax sub-title

"[t]o make, adopt and amend such rules and regulations as he shall deem necessary to carry out the provisions of this sub-title and to define any terms used herein."

Code (1947 Cum.Supp.), § 301(a). That conferral of rulemaking power remained unchanged to and through the assessment period involved here. *See* § 365(a).

Rule 5, Retail Sales and Use Tax Rules, adopted by the Comptroller in 1947, exempted receipts from the sale of newspapers. With the advent of COMAR in 1976, Rule 5 became COMAR § 03.06.01.05. Set forth below is original Rule 5, with numerals in brackets indicating the paragraph numbering which conformed original Rule 5 to the COMAR style.

### "[.05] NEWSPAPERS

"[A.] Receipts from the sale of newspapers are not subject to the tax.

"[1.] In order to constitute a newspaper, the publication must contain at least the following elements:

---

**4.** Md.Code (1939, 1947 Cum.Supp.), Art. 81, § 261(*o*) exempted from the tax "[s]ales of advertising space in newspapers, periodicals, and billboard advertising space, and sales of radio advertising."

"(a) It must be published at stated short intervals (usually daily or weekly).

"(b) It must not when its successive issues are put together constitute a book.

"(c) It must be intended for circulation among the general public.

"(d) It must contain matters of general interest and reports of current events.

"[2.] Notwithstanding the fact that the publication may be devoted primarily to matters of specialized interest, such as legal, mercantile, political, religious or sporting matters, if in addition to the special interest it serves, the alleged newspaper contains general news of the day, information of current events and news of importance and of current interest to the general public, it is entitled to be classified as a newspaper.

"[B.] Press clipping services are exempt from tax.

"[C.] Sales of mailing lists are taxable.

"[D.] Subscriptions to magazines or periodicals are not taxable, newsstand sales of the same are taxable." [5]

The exemption for newspapers in § 326(n) was enacted by Chapter 112 of the Acts of 1956. As introduced, the bill

---

**5.** When original Rule 5 was adopted Md.Code (1939, 1947 Cum.Supp.), Art. 76, title, "Publication of Laws," § 8 contained a definition of "newspaper." That statute, enacted by Chapter 905 of the Acts of 1941, read:

"As used in any law, ordinance, resolution, decree, or order of court, the term 'paper', 'newspaper', 'newspaper in general circulation', 'newspaper devoted to the dissemination of general news', or terms of similar import, shall be defined as a publication having the following requirements:

(1) It shall have at least four pages.

(2) It shall habitually contain news items, legal and general intelligence, reports of current events, editorial comments, advertising matter and other miscellaneous information of public interest generally found in the ordinary newspaper.

(3) It shall be published and distributed by sale at least once each week from an established place of business, and shall have been so published and distributed during the preceding six months, provided, however, that this six-month requirement shall not apply to any

would have added to the exemption in Code (1951), § 322(n) for "[s]ales of transportation and communication services," the language "including the printing and sales of newspapers and periodicals of any and all types." Periodicals were amended out of the bill, and the effective date was postponed one year to June 1, 1957.

Thereafter, in 1957, the Comptroller amended Rule 5 to add a paragraph which became ¶ E of Regulation .05 in COMAR.[6] In relevant part that paragraph read:

"E. The law was amended, effective June 1, 1957, to specifically exempt 'the printing and sales of newspapers'. Since the sale of newspapers had already been exempted under the provisions of this regulation, the sole effect of this amendment is to exempt from tax the printing of giveaway newspapers which are printed by an outside printer for a consideration."

The Comptroller's present regulation, COMAR § 03.06.-01.05, that was applied in the matter before us, was promulgated by a notice of proposed rulemaking on November 17, 1978. See 5 Md.R. 1742 (1978). The notice states that the "regulation will provide a more precise definition of the term 'newspaper' as used in the Retail Sales Tax Act, and delete obsolete and unrelated material from the existing regulation." The regulation was adopted January 12, 1979, in the form proposed. See 6 Md.R. 16 (1979). It reads in relevant part:

".05 Newspapers.

A. The sale of newspapers is not subject to the tax.

---

publication having actually issued one or more of its regular publications prior to June 1, 1941.

(4) It shall have general circulation throughout the community in which it is published.

(5) It shall be entitled to be entered as second-class matter in the United States mail, provided that nothing contained herein shall apply to Garrett County."

**6.** As was required by a former Administrative Procedure Act, Acts of 1957, Chapter 94, the Comptroller's office filed amended Rule 5 with the Secretary of State on July 18, 1957. The amendment is available at the State Archives.

(1) A publication is not a newspaper unless:

(a) It is published and distributed no less frequently than once each week;

(b) It does not, when its successive issues are put together, constitute a book;

(c) It is intended for circulation among the general public;

(d) It contains news items, legal and general intelligence, reports of current events, editorial comments, advertising matter, and other miscellaneous information of public interest generally found in the ordinary newspaper.

(2) The criteria set forth in § A(1), above, are minimum requirements, the meeting of which does not necessarily result in a publication being classified as a newspaper. A publication which meets the criteria set forth in § A(1), above, but which is in fact a magazine, shopping advertiser, community newsletter, tip sheet, or other publication which is not a newspaper in the common and popularly-accepted usage of the term, is not a newspaper for the purpose of this exemption. A publication is not disqualified solely because it is devoted primarily to matters of specialized interest, such as legal, mercantile, political, religious, or sporting matters.

(3) The sale of an item which is to be distributed as a component part of a newspaper, such as an advertising supplement, is not subject to the tax."

Present Regulation .05 was in effect approximately six months before MPG started business.

For MPG's argument to prevail this Court must conclude that the General Assembly intended "newspapers of any and all types," as used in § 326(n), to include pennysavers or shopping advertisers, so that Regulation .05's exclusion is invalid. *Cf. Comptroller v. Rockhill, Inc.*, 205 Md. 226, 107 A.2d 93 (1954) (where statute taxed, as sales, the charges for accommodations "regularly" furnished to the public for a consideration, Comptroller's rule invalid which applied statute to "all rentals in resort areas for terms of

four months or less," including occasional rentals by owners of non-investment vacation cottages).

In common and ordinary parlance the term "newspaper" does not conjure the image of a pennysaver. In the context of a sales and use tax statute, "newspaper" has been held not to include a pennysaver; *see Redwood Empire Publishing Co. v. State Bd. of Equalization,* 207 Cal.App.3d 1334, 255 Cal.Rptr. 514 (1989); *Green v. Home News Publishing Co.,* 90 So.2d 295 (Fla.1956); *Department of Revenue v. Skop,* 383 So.2d 678, 680 (Fla.App.1980); *G & B Publishing Co. v. Department of Taxation & Fin.,* 57 A.D.2d 18, 392 N.Y.S.2d 938, *appeal denied,* 42 N.Y.2d 807, 368 N.E.2d 45, 398 N.Y.S.2d 1029 (1977); *Memphis Shoppers News, Inc. v. Woods,* 584 S.W.2d 196 (Tenn.1979); *Shoppers Guide Publishing Co. v. Woods,* 547 S.W.2d 561 (Tenn.1977); and not to include an advertising supplement; *see Ragland v. K–Mart Corp.,* 274 Ark. 297, 624 S.W.2d 430 (1981); *Caldor, Inc. v. Heffernan,* 183 Conn. 566, 440 A.2d 767 (1981); *K Mart Corp. v. South Dakota Dep't of Revenue,* 345 N.W.2d 55 (S.D.1984); *Wisconsin Dep't of Revenue v. J.C. Penney Co.,* 108 Wis.2d 662, 323 N.W.2d 168 (1982).

*Contra see Hadwen, Inc. v. Department of Taxes,* 139 Vt. 37, 422 A.2d 255 (1980), *appeal dismissed,* 451 U.S. 977, 101 S.Ct. 2300, 68 L.Ed.2d 834 (1981) (a pennysaver is a newspaper); *Greenfield Town Crier, Inc. v. Commissioner of Revenue,* 385 Mass. 692, 433 N.E.2d 898 (1982) (publication which contained eighty-seven percent advertising but included matters of interest to a significant segment of the public was a newspaper); *Sears, Roebuck & Co. v. State Tax Comm'n,* 370 Mass. 127, 345 N.E.2d 893 (1976) (an advertising supplement is a newspaper); *Daily Record Co. v. James,* 629 S.W.2d 348 (Mo.1982) (an advertising supplement is a newspaper).

Even if the legislative sponsor of the exemption initially intended a very broad application for newspapers and periodicals of any and all types, the exclusion of periodicals from the bill necessarily made the meaning of "newspaper" critical to the exemption's application. The 1957 amend-

ment not only furnished no definition, but operated against the background of an existing regulation that required a "newspaper" to contain "general news of the day, information of current events, and news of importance and of current interest to the general public." If the Legislature intended to override the Comptroller's existing requirements and to include as "newspapers" periodicals devoted almost entirely to advertising, it would seem that the General Assembly would have adopted a statutory definition and effected a repeal of the Comptroller's existing regulatory definition.

After the 1957 enactment, the Comptroller amended Rule 5, stating "the sole effect" of the statutory amendment was to exempt printing of giveaway newspapers. The administrator's contemporaneous interpretation of the statute saw no expansion of the regulatory definition of "newspaper"; rather, the statute expanded the prior, regulatory based, exemption for sales of newspapers to include their printing as well.

This administrative interpretation of the effect of the 1957 statute has been confirmed by at least two amendments to § 326(n) which left the Comptroller's interpretation undisturbed. The original Sales Tax Act had exempted "[s]ales of transportation and communication services," Code (1947 Cum.Supp.), § 261(n), and, in 1957, the newspaper exemption was tacked onto communication services by an "including." By Chapter 452 of the Acts of 1968 (1968 Md.Laws at 789), communication services were deleted from subsection (n), and the newspaper exemption was tacked onto transportation services by an "and." In 1973, by Chapter 722 of the Acts of that year, § 326(n) was repealed and reenacted in order to add the exemption for photographic materials. These reenactments, while the Comptroller's interpretation of the effect of the 1957 newspaper exemption was expressed in the pre–1979 version of Regulation .05, are approvals by the General Assembly of that administrative interpretation. *See Washington Suburban Sanitary Comm'n v. C.I. Mitchell & Best Co.*, 303 Md. 544, 559, 495 A.2d 30, 37 (1985); *Board of Examiners in Op-*

*tometry v. Spitz,* 300 Md. 466, 477, 479 A.2d 363, 369 (1984); *Valentine v. Board of License Comm'rs of Anne Arundel County,* 291 Md. 523, 533–34, 435 A.2d 459, 464–65 (1981).

The above analysis has treated Rule 5 and Regulation .05 as interpretative rules. Whether Rule 5, prior to 1957, validly exercised the Comptroller's rule-making power under the Sales Tax Act to exempt sales of newspapers is perhaps only of historic interest today. The 1957 statute ratified Rule 5 as to sales and extended the exemption to printing. But the 1957 statute left undisturbed the administrative exercise of the power delegated to the Comptroller by the General Assembly to state the criteria which must be satisfied in order for a publication to be a newspaper for § 326(n) purposes. Regulation .05, pre- and post–1979, is a legislative rule.

The significance of the distinction between interpretative and legislative rules was stated by the Court in *Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977), where the issue was the meaning of "unemployed" in federal statutes establishing an experimental program for aid for dependent children of unemployed fathers (AFDC–UF). The district court had held that a person discharged for cause was unemployed, because that person was out of work. The Court approved a legislative rule, adopted by the delegate of the Secretary of the Department of Health, Education and Welfare, which excluded from unemployed persons those out of work because they had been discharged for misconduct. The Court reasoned:

"Congress ... expressly *delegated* to the Secretary the power to prescribe standards for determining what constitutes 'unemployment' for purposes of AFDC–UF eligibility. In a situation of this kind, Congress entrusts to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term. In exercising that responsibility, the Secretary adopts regulations with legislative effect. A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner.

"The regulation at issue in this case is therefore entitled to more than mere deference or weight. It can be set aside only if the Secretary exceeded his statutory authority or if the regulation is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"

*Id.* at 425–26, 97 S.Ct. at 2405–06 (citations and footnotes omitted). *See also id.* at 425 n. 9, 97 S.Ct. at 2405 n. 9; 2 K. Davis, *Administrative Law Treatise* § 7:11, at 57 (2d ed. 1979).

Nor did the Comptroller exceed the powers delegated by the General Assembly when the Comptroller amended Regulation .05 in 1979, in order to provide "a more precise definition" which "may result in the collection of taxes on certain sales upon which taxes are not presently being collected because of possible ambiguities in the existing regulation." 5 Md.R. 1742 (1978). The delegated rulemaking power is "[t]o make, adopt and amend." § 365(a). Even if the 1979 amendment of the regulation somewhat narrowed the scope of the exemption, the amendment is not thereby invalid. *See Dickman v. Commissioner of Internal Revenue,* 465 U.S. 330, 342–43, 104 S.Ct. 1086, 1093–94, 79 L.Ed.2d 343, 353–54 (1984) (commissioner may change an earlier interpretation and, for the first time, construe gift tax statutes to tax the value of the use of money); *National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 99 S.Ct. 1304, 59 L.Ed.2d 519 (1979) (approving amendment of regulation narrowing exemption for a "business league" to require promotion of the general objects of one or more lines of business).

The reenactment of § 326(n) after the 1957 modification of Rule 5 and before the 1979 amendment of Regulation .05 did not freeze the regulatory construction of § 326(n) so as to prevent any narrowing of the exemption in the 1979 regulation. The reason was well explained by Justice Douglas for the Court in *Helvering v. Wilshire Oil Co.,* 308 U.S. 90, 60 S.Ct. 18, 84 L.Ed. 101 (1939).

"[Reenactment] does not mean that a regulation interpreting a provision of one act becomes frozen into another act merely by reenactment of that provision, so that that administrative interpretation cannot be changed prospectively through exercise of appropriate rule-making powers. The contrary conclusion would not only drastically curtail the scope and materially impair the flexibility of administrative action; it would produce a most awkward situation. Outstanding regulations which had survived one Act could be changed only after a preview by the Congress. In preparation for a new revenue Act the Commissioner would have to prepare in advance new regulations covering old provisions. Their effectiveness would have to await Congressional approval of the new Act. The effect of such procedure, so far as time is concerned, would be precisely the same as if these new regulations were submitted to the Congress for approval. Such dilution of administrative powers would deprive the administrative process of some of its most valuable qualities—ease of adjustment to change, flexibility in light of experience, swiftness in meeting new or emergency situations. It would make the administrative process under these circumstances cumbersome and slow. Known inequities in existing regulations would have to await the advent of a new revenue act. Paralysis in effort to keep abreast of changes in business practices and new conditions would redound at times to the detriment of the revenue; at times to the disadvantage of the taxpayer. Likewise the result would be to read into the grant of express administrative powers an implied condition that they were not to be exercised unless, in effect, the Congress had consented. We do not believe that such impairment of the administrative process is consistent with the statutory scheme which the Congress has designed."

*Id.* at 100–01, 60 S.Ct. at 24 (citations omitted).

For these reasons, the Maryland Tax Court correctly applied § 326(n) and Regulation .05 in denying exemption

and refund to MPG.[7]

## II

### A

MPG submits that the analysis set forth in Part I, *supra,* renders Regulation .05 unconstitutional. It says that it may not be excluded from the class of newspapers exempted under § 326(n) based on the content of its publication. MPG's argument fails under the holding and analysis in the Court's most recent explication of the first amendment's protection against discriminatory taxation, *Leathers v. Medlock,* — U.S. ——, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991).

*Leathers* involved the Arkansas gross receipts tax, imposed on the receipts from sales of all tangible personal property and of certain services. Newspaper sales, by subscription and over the counter, and subscription sales of magazines were exempt. The complaining taxpayers were owners of cable television systems whose services were made taxable in 1987. Satellite broadcast services to home dish-antennae owners were made taxable in 1989. The Arkansas Supreme Court concluded that both cable and satellite broadcast services were of the same medium and that the Arkansas tax scheme was unconstitutional during the period of disparate treatment of the two services. *Leathers* held "that the State's extension of its generally applicable sales tax to cable television services alone, or to cable and satellite services, while exempting the print media, does not violate the First Amendment." —— U.S. at ——, 111 S.Ct. at 1447.

---

**7.** We have reviewed two documents offered by MPG that the Tax Court excluded from evidence, namely, a letter by the Anne Arundel County Executive on the occasion of National Free Paper Week and an article from the Wall Street Journal describing the competitive threat of pennysavers to the advertising revenues of daily newspapers. Because neither alters the legal effect of Regulation .05 or our construction of § 326(n), any error in the exclusion of the tendered exhibits was not prejudicial.

The Supreme Court has "said repeatedly that a State may impose on the press a generally applicable tax." *Leathers,* —— U.S. at ——, 111 S.Ct. at 1444, citing *Swaggart Ministries v. Board of Equalization of California,* 493 U.S. 378, ——, 110 S.Ct. 688, 695, 107 L.Ed.2d 796, 808 (1990); *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 229, 107 S.Ct. 1722, 1727, 95 L.Ed.2d 209, 219 (1987); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 586 & n. 9, 103 S.Ct. 1365, 1372–73 & n. 9, 75 L.Ed.2d 295, 305 & n. 9 (1983).

In *Leathers* the Court reviewed the holdings of *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), of *Minneapolis Star* and of *Arkansas Writers'.* *Grosjean* involved a Louisiana two percent gross receipts tax from advertising which applied only to publications with weekly circulations above 20,000, so that the tax fell exclusively on the thirteen largest newspapers. It was held unconstitutional.[8] *Minneapolis Star* involved a use tax on the cost of paper and ink which did not complement any sales tax. The first $100,000 worth of paper and ink consumed annually were exempt. Fourteen of the state's 388 paid circulation newspapers paid tax in the first year under the enactment, and sixteen out of 374 paid circulation newspapers paid the tax the following year. Two-thirds of the tax burden fell on the petitioning taxpayer. That tax was held to be invalid.

---

8. In *City of Baltimore v. A.S. Abell Co.,* 218 Md. 273, 145 A.2d 111 (1958), this Court described some of the background of the tax involved in *Grosjean.* We said:

"The late Huey Long had apparently centralized the executive and legislative powers of the State of Louisiana in his own hands. The larger newspapers were opposed to his *modus operandi* and did not hesitate to publish their sentiments, while the smaller periodicals were, in general, sympathetic to his cause. One of his reputed statements is to this effect: 'For each dollar these papers (the larger ones) take in, they tell a lie. There is no reason why the State of Louisiana should not receive two cents for each of these lies.'" *Id.* at 284, 145 A.2d at 116.

*Leathers* described *Arkansas Writers'* as having "reaffirmed the rule that selective taxation of the press through the narrow targeting of individual members offends the First Amendment. In that case, Arkansas Writers' Project sought a refund of state taxes it had paid on sales of the Arkansas Times, a general interest magazine, under Arkansas' Gross Receipts Act of 1941. Exempt from the sales tax were receipts from sales of religious, professional, trade and sports magazines. We held that Arkansas' magazine exemption, which meant that only 'a few Arkansas magazines pay any sales tax,' operated in much the same way as did the $100,000 exemption in *Minneapolis Star* and therefore suffered from the same type of discrimination identified in that case. Moreover, the basis on which the tax differentiated among magazines depended entirely on their content."
— U.S. at ——, 111 S.Ct. at 1443 (citations omitted).

From these cases the Court distilled its most recent statement of the governing principle, as follows:

"These cases demonstrate that differential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints. Absent a compelling justification, the government may not exercise its taxing power to single out the press. The press plays a unique role as a check on government abuse, and a tax limited to the press raises concerns about censorship of critical information and opinion. A tax is also suspect if it targets a small group of speakers. Again, the fear is censorship of particular ideas or viewpoints. Finally, for reasons that are obvious, a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech."
— U.S. at ——, 111 S.Ct. at 1443–44 (citations omitted).

The Maryland sales tax is extremely broad based. Persons who own no real property and whose income, if any, is insufficient to require the filing of a return pay the sales tax on their taxable purchases. Within the medium of printed matter, MPG enjoys the company of publishers of

hard-cover and paperback books, of magazines sold over the counter, of booklets, brochures, pamphlets, tracts, leaflets, folders, circulars, maps, directories and countless other kinds of published materials taxed in whole or in part at some stage in the process from publication to distribution to the ultimate user. MPG shares the company of merchants who wish to target printed advertising to their localities. Those merchants may either pay sales tax to a job printer for preparing the material, print themselves and pay sales tax on the ink and paper, or hire the services of an organization such as MPG which will pay the tax, at least directly. In the latter way, a merchant benefits by sharing the cost of distribution with others, all of whose ads are bundled together in a pennysaver, accompanied by a light sprinkling of local announcements. We see no threat to the dissemination of ideas in pennysavers because newspapers satisfying Regulation .05 are not taxed on their printing and sale costs, any more than the exemption for newspapers in Arkansas threatened the dissemination of ideas by cable television in *Leathers*. There is no "infringement."

MPG, however, asserts that Regulation .05 cannot separate shopping advertisers from newspapers which contain higher ratios of non-advertising matter to advertising matter, because that is a discrimination based on content. MPG emphasizes *Arkansas Writers'*. The Court there found a first amendment violation in the discrimination against a general interest magazine under the Arkansas sales tax statute which exempted sales of newspapers and of religious, professional, trade and sports magazines. *Arkansas Writers'* dealt with the content of non-commercial speech. MPG's pennysavers have been excluded from the class of newspapers because of their overwhelming commercial speech content. After *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), a court or an administrator must determine whether speech proposes a commercial transaction in order to determine if first amendment rights have been infringed. *See also Posadas De*

*Puerto Rico Assocs. v. Tourism Co.,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) (ban on advertising legalized casino gambling to local residents, as contrasted with tourists, upheld); *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444, 452–54 (1978) (ban on attorney's direct, in-person solicitations of prospective clients upheld).

Even if the Maryland sales tax scheme's impact on MPG were a restriction which required analysis under the first amendment, the analysis would be that applicable to commercial speech, found, *inter alia,* in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 564–66, 100 S.Ct. 2343, 2350–51, 65 L.Ed.2d 341, 349–51 (1980) (analyzing a prohibition against a public utility's advertising to encourage the consumption of electricity). In the commercial speech model, a court must look at the content of speech to determine if it is lawful and not misleading, and particularly to determine if the restriction is more extensive than necessary to serve the governmental interest directly advanced by the restriction. Here, there is no restriction of constitutional dimension.

MPG says that pennysavers are not commercial speech because they have carried columns by public officials commenting on public issues. The content of a publication, however, need not be 100% solicitation of business transactions in order to be viewed as commercial speech for first amendment purposes. *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), involved a ban on the unsolicited mailing of advertisements for contraceptives. Youngs Drug Products mass mailed multi-page, multi-item flyers promoting its products, but the flyers also included truthful information relevant to family planning and the prevention of venereal disease. *Id.* at 69, 103 S.Ct. at 2882. The trial court found that the mailings were commercial speech. That finding was upheld under all of the circumstances. The Court said:

"We have made clear that advertising which 'links a product to a current public debate' is not thereby entitled

to the constitutional protection afforded noncommercial speech. A company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions."

463 U.S. at 68, 103 S.Ct. at 2881 (citation and footnote omitted).

## B

MPG also contends that the term "shopping advertiser" in Regulation .05 is unconstitutionally vague. We interpret the argument to be that a business could reasonably conclude that its publication was a shopping advertiser, and not a newspaper, because of an inability to delineate between the two, and thereby be deterred from communicating ideas because of potential liability for the tax. It is unnecessary for us definitively to draw the line in this case. The sales tax is unquestionably applicable to MPG's printing, paper and ink costs for its pennysavers because they are overwhelmingly advertising. Essentially MPG is arguing the possible rights of some other taxpayer as publisher of a different publication. The United States Supreme Court recognizes an exception, in certain first amendment cases, from the traditional rules of standing, and allows a litigant to raise the first amendment rights of third parties. This exception "has reflected the Court's judgment that the very existence of some statutes may cause persons before the Court to refrain from engaging in constitutionally protected speech or expression." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 60, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310, 320 (1976). *Young* involved a zoning restriction on adult theaters exhibiting " 'material distinguished or characterized by an emphasis on matter depicting, describing or relating to "Specified Sexual Activities" or "Specified Anatomical Areas." ' " *Id.* at 53, 96 S.Ct. at 2444. In *Young* the reason for the exception to the standing requirement did not apply. The Court said:

"Since there is surely a less vital interest in the uninhibited exhibition of material that is on the borderline between pornography and artistic expression than in the free dissemination of ideas of social and political significance, and since the limited amount of uncertainty in the ordinances is easily susceptible of a narrowing construction, we think this is an inappropriate case in which to adjudicate the hypothetical claims of persons not before the Court."

*Id.* at 61, 96 S.Ct. at 2448. MPG's commercial speech is also in an intermediate category of speech. *See* L. Tribe, *American Constitutional Law* § 12–18, at 939–40 (2d ed. 1988). We need not decide a hypothetical, closer case at the instance of MPG.

There is no constitutional violation.

JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.