3 P.3d 992

The ARIZONA DEPARTMENT OF REVENUE, Plaintiff–Appellee,

v.

GREAT WESTERN PUBLISHING, INC., Defendant–Appellant.

No. 1 CA–TX 98–0019.

Court of Appeals of Arizona, Division 1, Department T.

Sept. 23, 1999.

Review Denied March 14, 2000.

## OPINION

BERCH, Judge.

¶ 1 This appeal raises the question whether *The Valley Classifieds,* a weekly publication consisting almost entirely of classified and paid display advertising, qualifies as a "newspaper" for purposes of an Arizona tax statute. We conclude that it does not and affirm the judgment of the tax court.

## BACKGROUND

¶ 2 Appellant Great Western Publishing prints *The Valley Classifieds.* Designed primarily as an advertising publication that is distributed free of charge to consumers, *The Valley Classifieds* is printed on newsprint and published weekly in four editions. The publication has an average readership of 200,000 and a repeat readership of approximately 140,000.

¶ 3 Although display and classified advertisements comprise the vast majority of each issue, approximately 10% of *The Valley Classifieds* consists of a masthead that identifies the publisher and its staff, television listings, word puzzles, public service telephone numbers, weather reports, unpaid reviews of restaurants written by restaurant personnel, movie listings, auction and sale notices, calendars of community and sporting events, occasional articles about health care (primarily in the Spanish language edition), and legal notices. *The Valley Classifieds* does not contain editorials, reports on current events, or general news articles.

¶ 4 From October 1989 through September 1993, Great Western collected $174,564.77 in job-printing transaction privilege taxes and remitted the taxes to the Arizona Department of Revenue ("ADOR"). Great Western then sought a refund of those taxes, arguing that its earnings from printing *The Valley Classifieds* were deductible from its tax base under A.R.S. section 42–1310.06(B)(1)(b) (1991 and Supp.1998)[1] because the publica-

Janet A. Napolitano, The Attorney General by Sara D. Branscum Assistant Attorney General, Phoenix, for Plaintiff–Appellee.

Mariscal, Weeks, Mcintyre & Friedlander, P.A. by Brian M. Mueller, Phoenix, for Defendant–Appellant.

1. Amended and renumbered as A.R.S. section 42–5066(B)(1)(b) (1999). Section 42–1310.06 provided, in relevant part, as follows:

    A. The job printing classification is comprised of the business of job printing, engraving, embossing and copying.

    B. The tax base for the job printing classification is the gross proceeds of sales or gross income derived from the business, but the gross proceeds of sales or gross income derived from the following shall be deducted from the tax base:

tion was a "newspaper." ADOR denied the request. After Great Western prevailed before the State Board of Tax Appeals, ADOR appealed to the tax court.

¶ 5 Both parties moved for summary judgment in the tax court. In granting ADOR's motion and denying Great Western's motion, the tax court held that (1) *The Valley Classifieds* was not a "newspaper" and therefore was not entitled to the statutory deduction, and (2) precluding *The Valley Classifieds* from claiming the exemption did not constitute content-based discrimination that would violate the First Amendment. Great Western appealed. We have jurisdiction under A.R.S. section 12–2101(B) (1994).

## DISCUSSION

A. *Valley Classifieds' Status as a Newspaper*

¶ 6 Great Western argues that the tax court erred in holding that *The Valley Classifieds* was not a "newspaper" for purposes of section 42–1310.06(B)(1)(b). Great Western points out that several qualities of *The Valley Classifieds*—for example, newsprint, classified ads, movie listings, and a calendar of local events—were typical of features found in a "newspaper."

¶ 7 In determining that *The Valley Classifieds* did not qualify for the newspaper exemption, ADOR applied the following definition of "newspaper": "[A] paper that is printed and distributed daily, weekly, or at some other regular and usually short interval and that contains news, articles of opinion (as editorials), features, advertising, or other matter regarded as of current interest." *Arizona Transaction Privilege Tax Ruling TPR* 93–29, Ariz. Tax Rptr. 300–051 (May 10, 1993) (quoting *Webster's Third New International Dictionary* 1524 (G. & C. Merriam Co.1971)). Great Western asserts that ADOR may not "narrow" the reach of section 42–1310.06(B)(1)(b) by adopting its own definition of "newspaper." Ordinarily, however,

we defer and give great weight to an agency's interpretation of a statute it is charged with implementing or enforcing unless we conclude that the legislature intended a different interpretation. *See U.S. Parking Systems v. City of Phoenix,* 160 Ariz. 210, 211, 772 P.2d 33, 34 (App.1989); *accord Maryland Pennysaver Group, Inc. v. Comptroller of the Treasury,* 323 Md. 697, 594 A.2d 1142, 1146–47 (1991). We do not conclude that a different interpretation was intended in this case.

¶ 8 As with all statutes, we must interpret section 42–1310.06(B)(1)(b) to give effect to the legislature's intent. *See State v. Korzep,* 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990); *Martin v. Martin,* 156 Ariz. 452, 457, 752 P.2d 1038, 1043 (1988). In the usual case, we look first to the statute itself to determine its meaning. *See Rio Rico Properties, Inc., v. Santa Cruz County,* 172 Ariz. 80, 89, 834 P.2d 166, 175 (Tax 1992). But nowhere is "newspaper" defined in the Arizona tax statutes. Absent a statutory definition, we must construe the statute according to the "common and approved use of the language." A.R.S. § 1–213 (1995); *see also Wells Fargo Credit Corp. v. Tolliver,* 183 Ariz. 343, 345, 903 P.2d 1101, 1103 (App.1995) (statutory language is the best indicator of legislative intent and we will give terms "their ordinary meanings"). To verify our perception of the "common and approved" meaning of statutory terms, we may—as did ADOR—resort to well-known, authoritative dictionaries of English. *See, e.g., Ruiz v. Hull,* 191 Ariz. 441, 450, 957 P.2d 984, 993 (1998); *City of Glendale v. Aldabbagh,* 189 Ariz. 140, 142, 939 P.2d 418, 420 (1997).

¶ 9 Webster's defines "newspaper" as a "publication, usu[ally] issued daily or weekly and containing news, comment, features, and advertising." Random House Webster's College Dictionary 882 (2d ed.1997). "News" is defined as "a report of a recent event; information. . . ." *Id.* Applying these definitions, we conclude that *The Valley Classifieds* was not a "newspaper" for the simple reason that

1. Sales to a person in this state who has a transaction privilege tax license issued in this state, and who does either of the following:
   (a) Resells the job printing, engraving, embossing or copying.

(b) Distributes such printing, engraving, embossing or copying without consideration in connection with the publication of a newspaper or magazine.

it did not contain several key factors of a "newspaper," such as news and editorials.

¶ 10 Great Western argues that its advertisements, by themselves, convey "news" because they provide information on matters of public interest. As significant in our society as classified ads may be, however, they do not convey editorial opinions or reports of recent events, and, therefore, do not convey "news" as that term is commonly understood. By holding as we do, we make no value judgment as to the social utility of classified and display advertising; rather, we hold only that a publication that has as its fundamental purpose the distribution of advertisements to the public does not constitute a "newspaper" as that term is commonly understood.

¶ 11 Other courts have reached the same conclusion on similar facts. *See, e.g., Gallacher v. Commissioner of Revenue Servs.*, 221 Conn. 166, 602 A.2d 996, 1002 (1992) ("TV Facts," which contained "no articles of opinion, such as editorials, advocates no opinions, and does not carry items of general news interest" is not a "newspaper," even though it contained a gossip column, TV program listings, astrology column, and crossword puzzle); *Maryland Pennysaver Group*, 594 A.2d at 1146 ("In common and ordinary parlance the term 'newspaper' does not conjure the image of a pennysaver."); *Department of Revenue v. Skop*, 383 So.2d 678, 680–81 (Fla.App.1980) (advertising weekly with 85% advertising and 15% local news, recipes, horoscopes, and calendars was not a "newspaper"); *G & B Publ'g Co. v. Department of Taxation & Fin., Sales Tax Bureau*, 57 A.D.2d 18, 392 N.Y.S.2d 938, 939–40 (1977) (advertising weekly was not "newspaper" because it rarely contained reports of current events or issues of general interest and never contained articles of opinion).

¶ 12 In *Gallacher*, the Connecticut Supreme Court considered whether a publication entitled *TV Facts*—which consisted of television listings, puzzles, and advertisements, but no editorials or news—was entitled to the Connecticut use tax exemption for "newspapers." *See Gallacher*, 602 A.2d at 998. The court held that it was not:

> [N]ot surprisingly, the cases and authorities generally indicate that news is com-

monly thought to be a necessary component of a newspaper.... Other courts confronted with the question, "What is a newspaper?" have formulated comparable common sense answers. "[P]ublications and pennysavers such as the petitioner's which do not contain news articles or expressions of opinion are generally not newspapers within the meaning of the Tax Law."

*Id.* at 1001 (quoting *Scotsmen Press v. Tax Appeals Tribunal*, 165 A.D.2d 630, 634, 569 N.Y.S.2d 991, 993 (1991)). We concur with this assessment.

¶ 13 The cases upon which Great Western relies are distinguishable, unpersuasive, or both. Some contain no analysis of what "news," if any, a newspaper must contain. *See, e.g., Hadwen, Inc. v. Department of Taxes*, 139 Vt. 37, 422 A.2d 255 (1980) (declining to "adopt a definition of 'newspaper' publications based upon their content"). Others simply involve different facts. *See, e.g., Greenfield Town Crier, Inc. v. Commissioner of Revenue*, 385 Mass. 692, 433 N.E.2d 898, 901 (1982) (publication held to be a "newspaper" because approximately twelve percent of print space was devoted to news and columns of interest, and it was distributed at regular intervals). Still others decided only that advertising inserts were "parts" of "newspapers" for purposes of sales or use tax exemptions, a matter not at issue in this case. *See Appeal of K–Mart Corp.*, 238 Kan. 393, 710 P.2d 1304, 1310 (1985); *Eagerton v. Dixie Color Printing Corp.*, 421 So.2d 1251, 1254 (Ala.1982); *Sears, Roebuck & Co. v. State Tax Comm'n*, 370 Mass. 127, 345 N.E.2d 893, 896 (1976); *Indiana Dep't of State Revenue v. L.S. Ayres & Co.*, 486 N.E.2d 563, 564–65 (Ind.App.1985); *Laneco, Inc. v. Commonwealth*, 103 Pa.Cmwlth. 355, 520 A.2d 542, 545 (1987). We must determine whether a publication that resembles only the advertising section is itself a newspaper. Because we conclude that *The Valley Classifieds* was not a "newspaper," we hold that it does not qualify for the exemption in section 42–1310.06(B)(1)(b).

## B. First Amendment Implications

¶ 14 Great Western next argues that excluding publications such as *The Valley*

*Classifieds* from the reach of section 42-1310.06(B)(1)(b) violates the First Amendment because the tax deduction discriminates among publications based on their content. Citing *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), and *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), Great Western asserts that providing a tax deduction based on the "content" of the publication overstates any constitutionally significant distinction between commercial and non-commercial speech and is categorically invalid. For several reasons, we disagree.

¶ 15 First, Great Western's reliance on *Discovery Network* and *Virginia State Board of Pharmacy* is misplaced. Both cases concerned outright bans on particular types of speech. *See Discovery Network*, 507 U.S. at 430, 113 S.Ct. 1505 (striking down city ordinance that banned the distribution of "commercial handbills" on public property); *Virginia State Board of Pharmacy*, 425 U.S. at 770, 96 S.Ct. 1817 (declaring unconstitutional a statute that prohibited advertising of prescription drug prices). Because nothing in the statute bans or purports to ban Great Western's speech, we find that neither case contributes significantly to the analysis of whether differential taxation of newspapers and advertising communications impermissibly impinges upon Great Western's First Amendment rights.

¶ 16 Second, Great Western's argument is premised on the assumption that the differential treatment of advertising organs and newspapers and magazines in Arizona's taxation scheme for job-printing gross income is based on the publication's "content." Although courts differ on this point, we conclude that the Arizona scheme is not constitutionally infirm.

¶ 17 Some jurisdictions hold that reliance on such criteria does not implicate the First Amendment at all. *See, e.g., Gallacher*, 602 A.2d at 1002-05. In *Gallacher*, the court considered whether excluding an advertising organ similar to *The Valley Classifieds* from a "newspaper" exemption ran afoul of the First Amendment because it was based on

the publication's "content." *See id.* at 1002-03. The court held that it did not, observing that newspapers are distinguished from other publication forms not by differences in the content or viewpoint of the writings that appear in them, but rather "by the type of material, regardless of its content or viewpoint, that must appear in a publication to have it constitute a newspaper. For example, a universal requirement for a newspaper is that it contain news." *Id.* at 1002-03; *see also Redwood Empire Pub. Co. v. State Bd. of Equalization*, 207 Cal.App.3d 1334, 255 Cal.Rptr. 514, 518 (1989) (regulatory distinction between advertising organs and newspapers is "content-neutral" because it is based on the "form of communication (advertising) as opposed to its content"); *Magazine Publishers of America v. Commonwealth Dep't of Revenue*, 539 Pa. 563, 654 A.2d 519, 522 n. 6, 523 (1995) (definition of "newspaper" that included "conveying reading or pictorial intelligence of passing events, local or general happenings, printing regularly or irregularly editorial comment, announcements, miscellaneous reading matter, commercial advertising, classified advertising, legal advertising, and other notices" was content-neutral because it was based on "format and frequency of publication," not "content"); *Hearst Corp. v. Iowa Dep't of Revenue & Fin.*, 461 N.W.2d 295, 303 (Iowa 1990).

¶ 18 Other jurisdictions have held that basing a "newspaper" exemption on criteria such as inclusion of "news of importance and of current interest to the general public," or the like, amounts to discrimination according to the "content" of speech in violation of the First Amendment. *See, e.g., Emmis Publ'g Corp. v. Indiana Dep't of State Revenue*, 612 N.E.2d 614 (Ind.Tax 1993). For example, in *Emmis*, an Indiana regulation provided that a publication could not qualify for that state's "newspaper" exemption from the sales tax unless it was, among other criteria, "published for the dissemination of news of importance and of current interest to the general public, general news of the day, and information of current events." *Id.* at 618 (quoting Ind. Admin. Code tit. 45, r. 2.2-5-26). Without stating why, that tax court expressly

disapproved of the Connecticut Supreme Court opinion in *Gallacher:*

> [T]he *Gallacher* court drew a distinction between discrimination based upon the viewpoint or content of a publication and discrimination based upon the "type of material".... This court, however, finds unpersuasive the distinction between the content or viewpoint of material on the one hand, and the "type of material" on the other, to determine whether a particular "type of material" constitutes "news of importance and of current interest to the general public, general news of the day, and information of current events" as required by 45 I.A.C. 2.2–5–26(b)(2).

*Id.* at 621 (citation omitted). Other courts have ruled similarly, finding the viewing of the type of entry in a publication to be a content-based determination. *See also Department of Revenue v. Magazine Publishers of Am., Inc.,* 604 So.2d 459, 462 and n. 2 (Fla.1992) (regulatory criterion for "newspaper" that requires the agency to determine whether a publication contains "reports of current events and matters of general interest which appeal to a wide spectrum of the general public" is content-based); *H.J. Wilson Co., Inc. v. State Tax Comm'n,* 737 So.2d 981, ¶¶ 15–31 (Miss.1998) ("newspaper" criterion that publication be "originated and published for the dissemination of current news and intelligence of varied, broad and general public interest, announcements and notices, opinions as editorials on a regular or irregular basis, and advertising and miscellaneous reading matter" is content-based and violates First Amendment); *Southern Living, Inc. v. Celauro,* 789 S.W.2d 251 (Tenn.1990).

■ ¶ 19 We find the cases exemplified by *Gallacher* both more persuasive and more faithful to the underlying First Amendment principles articulated by the United States Supreme Court. Genuine "content-based" discrimination that runs afoul of the First Amendment is that which turns on disparate, unfavorable treatment, or the threat or danger of such treatment, for expressing particular ideas or viewpoints. *See Leathers v. Medlock,* 499 U.S. 439, 447–49, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991). By themselves, legislative taxing distinctions among

different types of publications—for example, newspapers versus advertising organs or magazines—are not necessarily content-based in the constitutional sense. *See* Ronald D. Rotunda and John E. Nowak, *Treatise of Constitutional Law* § 20.22, at 123–25 n. 12 (2d ed. 1992) ("[W]hen there is a complaint that a tax discriminates among the media, or within a medium, the first amendment is not implicated unless the tax is directed at, or presents the danger of,· suppressing particular ideas.").

¶ 20 In *Leathers,* the State of Arkansas imposed a gross receipts tax on sales of all tangible personal property and certain services, including cable television and scrambled satellite broadcast television services, but not on newspaper or subscription magazine sales. *See Leathers,* 499 U.S. at 442, 111 S.Ct. 1438. The Court rejected a challenge that the taxation scheme violated the First and Fourteenth Amendment rights of cable and satellite subscription service providers. Synthesizing the holdings of *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 229–31, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), *Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 585, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), and *Grosjean v. American Press Co.,* 297 U.S. 233, 244–49, 56 S.Ct. 444, 80 L.Ed. 660 (1936), the Court reasoned that the critical inquiry was whether the regulation threatened to suppress the expression of particular views or ideas:

> These cases demonstrate that differential taxation of First Amendment speakers is constitutionally suspect when it *threatens to suppress the expression of particular ideas or viewpoints.* Absent a compelling justification, the government may not exercise its taxing power to single out the press. The press plays a unique role as a check on government abuse, and a tax limited to the press raises concerns about censorship of critical information and opinion. A tax is also suspect if it targets a small group of speakers. *Again, the fear is censorship of particular ideas or viewpoints.* Finally, for reasons that are obvious, a tax will trigger heightened scrutiny under the First Amendment if it *discrimi-*

*nates on the basis of the content of taxpayer speech.*

*Leathers,* 499 U.S. at 447, 111 S.Ct. 1438 (emphasis added) (citations omitted).

¶ 21 The Court then analyzed the features of the Arkansas tax that rendered it nondiscriminatory: It did not single out the press and therefore did not "threaten to hinder the press as a watchdog of government activity"; it did not target a particular medium "in a purposeful attempt to interfere with its First Amendment activities"; it did not "select[ ] a narrow group to bear fully the burden of the tax"; and it was "not content based." *Id.* at 447–49, 111 S.Ct. 1438. Arizona's taxation scheme shares these features. Under the Supreme Court's reasoning, then, the Arizona statute at issue would not violate the First Amendment.

¶ 22 The Court in *Leathers* rested its reasoning on two foundational points. First, the Court emphasized the established rule that tax provisions that *discriminate among* speakers do not implicate the First Amendment unless they discriminate "on the basis of ideas." *Leathers,* 499 U.S. at 450–51, 111 S.Ct. 1438 (citing *Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 544–51, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983)). Second, drawing support from its non-tax opinions in *Mabee v. White Plains Publishing Co.,* 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607 (1946), and *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), the Court stressed that placing different burdens on speakers does not by itself raise First Amendment concerns:

> [D]ifferential taxation of speakers, even members of the press, does not implicate the First Amendment unless the tax is directed at, or presents the danger of suppressing, particular ideas. . . . The Arkansas Legislature has chosen simply to exclude or exempt certain media from a generally applicable tax. Nothing about that choice has ever suggested an interest in censoring the expressive activities of cable television. Nor does anything in this record indicate that Arkansas' broad-based, content-neutral sales tax is likely to stifle the free exchange of ideas. We

conclude that the State's extension of its generally applicable sales tax to cable television services alone, or to cable and satellite services, while exempting the print media, does not violate the First Amendment.

*Leathers,* 499 U.S. at 453, 111 S.Ct. 1438.

■ ¶ 23 Contrary to Great Western's assertions, "content," in its constitutional sense, refers not to general categories or styles of communication such as news, features, classified advertising, community calendars, or horoscopes, but rather to the "particular ideas or viewpoints" that may be expressed. Thus the statute at issue here does not discriminate based on the content on the speech.

■ ¶ 24 As in *Leathers,* nothing in the record in this case suggests any legislative interest in censoring the "expressive activities" of advertising organs or indicates that the application of the job printing transaction privilege tax "is likely to stifle the free exchange of ideas." *Id.* Section 42–1310.06(B)(1)(b) merely allows the taxation of the commercial services by which advertising organs are prepared. A government that chooses to subsidize one protected right, such as the publication of newspapers, is not required to subsidize "analogous counterpart rights," such as the publication of advertising organs. *See Gallacher,* 602 A.2d at 1004 (quoting *Rust v. Sullivan,* 500 U.S. 173, 194, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)); *Regan,* 461 U.S. at 544–51, 103 S.Ct. 1997 (First Amendment does not require that governmental subsidies represented by tax exemptions and deductions be extended to all taxpayers); *Hearst Corp.,* 461 N.W.2d at 304 (legislature "may subsidize one form of publication (i.e., 'newspapers'), but is not required by the first amendment to also subsidize other forms of publications as long as it has a rational, noncontent basis for doing so").

¶ 25 The tax court correctly granted summary judgment for ADOR. We affirm.

CONCURRING: E.G. NOYES, Jr., Judge, and JON W. THOMPSON, Judge.