# Vermont Society of Association Executives, et al. v. James F. Milne, Secretary of State

[779 A.2d 20]

No. 00-032

Present: Amestoy, C.J., Dooley, Morse and Skoglund, JJ., and Cheever, Supr. J., Specially Assigned

Opinion Filed June 8, 2001
Motion to Amend Denied August 15, 2001

*Robert B. Hemley* of *Gravel and Shea,* Burlington, *Nory Miller* of *Jenner & Block,* and *Jerald A. Jacobs* of *Shaw Pittman Potts & Trowbridge (Of Counsel),* Washington, D.C., for Plaintiffs-Appellees.

*William H. Sorrell,* Attorney General, and *Bridget C. Asay,* Assistant Attorney General, Montpelier, for Defendant-Appellant.

**Skoglund, J.** In this appeal, the Secretary of State challenges the superior court's ruling that Vermont's tax on lobbying expenditures is unconstitutional. We conclude that, in singling out and burdening interests protected by the First Amendment, the lobby tax violates the United States Constitution under the heightened scrutiny required. Accordingly, we affirm the superior court's judgment.

Effective January 1, 1998, the Legislature imposed a five-percent tax "on the expenditures of lobbyists and employers of lobbyists. . . . in excess of $2,500.00." 2 V.S.A. § 264a(a).[1] The tax is expressly restricted to expenditures connected with communications or activities aimed at influencing legislation or administrative action. See 2 V.S.A. § 261(5), (9) (defining terms "Expenditure" and "lobbying"). The lobby tax was enacted as part of a campaign finance reform statute that established a fund to provide public grants to candidates running for

---

[1] In its entirety, the challenged statute provides as follows:

### § 264a. Tax on expenditures of lobbyists

(a) There is imposed and shall be collected a tax on the expenditures of lobbyists and employers of lobbyists. The tax shall be at the rate of five percent of the amount of the expenditures in excess of $2,500.00 required to be reported in each calendar year by lobbyists and employers of lobbyists under section 264 of this title.

(b) The tax shall be paid to the secretary of state at the time that each periodic disclosure report is required to be filed under section 264(a) of this title.

(c) If any tax is not paid when due under subsection (b) of this section, the secretary shall notify the commissioner of taxes of the name, address and taxpayer identification number of such taxpayer and any other information necessary to determine the tax liability. The commissioner of taxes shall collect and enforce the tax imposed by this section, and shall have all the powers granted the commissioner for the collection and enforcement of the sales and use tax under chapter 233 of Title 32. Persons liable for the payment of the tax imposed by this section shall be subject to all penalties imposed on and have all rights of appeal afforded to persons liable for payment of the sales and use tax under chapter 233 of Title 32.

(d) All revenues collected by the secretary of state and the commissioner of taxes from the tax imposed by this section shall be submitted to the state treasurer for deposit in the Vermont campaign fund established under section 2856 of Title 17.

the offices of governor and lieutenant governor. 1997, No. 64, § 2. The tax was earmarked as one of the primary sources to fund these grants. § 264a(d) (all revenues collected from lobby tax "shall be submitted to the state treasurer for deposit in the Vermont campaign fund established under section 2856 of Title 17").

Plaintiffs, a group of nonprofit organizations employing lobbyists, initially filed a declaratory judgment action in the superior court alleging that the lobby tax unconstitutionally singled out and burdened protected First Amendment activities and violated equal protection guarantees. Plaintiffs requested that the court declare § 264a unconstitutional and enjoin the Commissioner of Taxes from enforcing the tax. The Secretary of State (hereinafter "the State") moved to dismiss the suit on the ground that plaintiffs had failed to exhaust administrative remedies established by statute for challenging the imposition of a tax. See 32 V.S.A. § 9777(a) (taxpayer may request hearing before commissioner to challenge assessment of unpaid taxes); 32 V.S.A. § 9781(a) (taxpayer may request tax refund from commissioner). The superior court denied the motion. Later, pursuant to the parties' agreement, one of the plaintiffs, Home Builders Association, requested a refund of taxes it had paid under § 264a. The commissioner denied the request, and that denial was appealed to the superior court, where it was consolidated with the declaratory judgment action. The parties then filed opposing motions for summary judgment.

The superior court granted summary judgment in favor of plaintiffs. Applying strict scrutiny, the court ruled that the lobby tax violates the First Amendment under the analysis set forth in *Leathers v. Medlock*, 499 U.S. 439 (1991). The court also concluded that the tax violates the equal protection provision of the Fourteenth Amendment and results in an unconstitutional double taxation of lobbyist expenditures. The court made no separate analysis under the Vermont Constitution, but determined that the tax violated the Vermont counterparts to the relevant federal constitutional provisions. The parties have not addressed on appeal whether the Vermont Constitution provides an alternative basis to strike down § 264a.[2]

The State argues on appeal that the superior court erred in (1) subjecting § 264a to heightened scrutiny under the First Amendment, (2) holding the statute unconstitutional under the First and

[2] Because plaintiffs have not challenged § 264a under the Vermont Constitution, and our resolution of their First Amendment claim resolves the parties' dispute, we need not consider whether the statute also violates our state constitution. See *State v. Jewett*, 146 Vt. 221, 222, 500 A.2d 233, 234 (1985).

Fourteenth Amendments to the United States Constitution, (3) reaching unbriefed claims under the Vermont Constitution, and (4) asserting jurisdiction over plaintiffs' claims without requiring them to first exhaust their administrative remedies. There are no facts in dispute. We apply de novo review to resolve the legal issue raised by the parties. See *O'Donnell v. Bank of Vermont*, 166 Vt. 221, 224, 692 A.2d 1212, 1214 (1997) (motion for summary judgment is reviewed under same standard as that applied by trial court).

The parties' characterizations of the lobby tax are in marked contrast to one another. In the State's view, § 264a is merely a generally applicable sales tax on the expenditures of a commercial service — lobbying — without regard to the content of the message provided by the service. To plaintiffs, however, § 264a is a special tax that unconstitutionally singles out and burdens core political speech protected by the First Amendment's right to petition the government. Under United States Supreme Court case law, if the State's characterization of § 264a as a generally applicable, content-neutral extension of the sales tax is correct, the statute is reviewed under a deferential rational-basis standard. On the other hand, if plaintiffs are correct that § 264a is a special tax burdening First Amendment interests, we apply a heightened standard of review, under which the State has conceded it cannot prevail. For the reasons set forth below, we agree with plaintiffs that the lobby tax is a special tax singling out First Amendment interests and thereby requiring heightened scrutiny.

## I.

### A.

Because the State questions the general notion of applying heightened scrutiny to a tax directed at lobbyists, as opposed to the press, we first consider the status of lobbying as a protected First Amendment interest. In relevant part, the First Amendment of the United States Constitution, which was made applicable to the states with the ratification of the Fourteenth Amendment, forbids laws "abridging the freedom of speech, or of the press; or the right of the people . . . to petition the Government for a redress of grievances." The United States Supreme Court has never defined the scope of the right to lobby in any in-depth analysis, but lobbying unquestionably concerns core political speech that "implicates First Amendment guarantees of petition, expression, and assembly." *Kimbell v. Hooper*, 164 Vt. 80, 83, 665 A.2d 44, 46 (1995); see *United States v. Harriss*, 347 U.S. 612, 625 (1954).

The venerable right to petition one's government to redress grievances extends back to the Magna Carta, where the Crown first formally recognized its duty to be accessible to all citizens. A. Thomas, *Easing the Pressure on Pressure Groups: Toward a Constitutional Right to Lobby*, 16 Harv. J.L. & Pub. Pol'y 149, 181-82 (1993). In America, the history of influencing legislative action began with the New Englander's personal appearance in the town meeting to make a complaint or request some sort of action. 1 N. Singer, Statutes and Statutory Construction § 13.02, at 657 (5th ed. 1994). At times, a neighbor might speak for a fellow citizen unable to attend the meeting. "That neighbor was the first American lobbyist." *Id.*

That innocent beginning was soon to fall upon "evil ways" as aggressive new industries sought to obtain concessions from local, state, and federal legislators. Singer, *supra*, at 657. Recognizing the potential danger to our democratic system posed by abuses in lobbying, Congress and state governments passed reform statutes that required lobbyists to disclose who they were representing and how much they were spending on their clients' behalf. See *id.* § 13.04, at 663. These disclosure laws were generally upheld because they prevented special interest groups from drowning out "the voice of the people" and yet placed only an incidental burden on the right to petition one's government. *Harriss*, 347 U.S. at 625; see *Kimbell*, 164 Vt. at 85, 665 A.2d at 48 ("lobbying disclosure laws are supported by several compelling [governmental] interests" vital to protecting integrity of democratic process); *Fair Political Practices Comm'n v. Superior Court*, 599 P.2d 46, 53-54 (Cal. 1979) (requiring lobbyists to register and disclose expenditures does not substantially interfere with ability of lobbyists to raise their voices). Although courts, at least implicitly, recognized in these and other decisions that lobbying implicates First Amendment interests, there has been no detailed judicial analysis concerning the scope of the right to lobby, perhaps because of the lingering distrust of lobbying that has persisted in our society. See generally Thomas, *supra*, at 149-51, 160-66, 179-80.

■ Nevertheless, it is beyond dispute that lobbying directly involves core political speech that lies at the very heart of what the First Amendment was designed to safeguard. See *Burson v. Freeman*, 504 U.S. 191, 196 (1992) (plurality opinion) (noting that one of three central concerns of First Amendment jurisprudence is "regulation of political speech"); *Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (D.C. Cir. 1968) ("While the term 'lobbyist' has become encrusted with invidious connotations, every person or group engaged . . . in trying

to persuade Congressional action is exercising the First Amendment right of petition."); *Moffett v. Killian*, 360 F. Supp. 228, 231 (D. Conn. 1973) (it is "beyond dispute that lobbyists and their employers . . . have First Amendment rights"); *Fidanque v. Oregon Gov't Standards & Practices Comm'n*, 969 P.2d 376, 379 (Or. 1998) ("Lobbying is political speech, and being a lobbyist is the act of being a communicator to the legislature on political subjects."). "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). That is the case because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964).

■ This is no less true because lobbyists are often paid to petition the government on behalf of others. See *Fair Political Practices Comm'n*, 599 P.2d at 53 (lobbyist's function is obviously to exercise constitutional right to petition on behalf of employer); N. Singer, *supra*, § 13.16, at 684 (need and right to communicate with legislative bodies through medium of third party acting as spokesperson "appears hardly less fundamental" than other most basic tenants of our constitutional liberties safeguarded by First Amendment). "The mere fact . . . that one earns a living by exercising First Amendment rights does not vitiate the ability to assert those rights." *Moffett*, 360 F. Supp. at 231. Nor does one forfeit First Amendment rights merely by paying another to exercise them for him. *Id.* Indeed, notwithstanding the potential abuses posed by lobbying, the modern-day reality is that, in order to be effective, groups and organizations across the political spectrum are compelled to retain skilled legislative counsel to present positions concerning complex issues that often require significant research and investigation. N. Singer, *supra*, § 13.16, at 684 (legislatures should have benefit of best information available when legislating). Thus, the communications of paid lobbyists deserve no less constitutional protection than that afforded to the direct entreaties of individual citizens. *Id.*

Of course, we do not mean to suggest that lobbying is immunized from regulation. To the contrary, as noted, courts have routinely upheld lobbying disclosure statutes. See *Harriss*, 347 U.S. at 625-26; *Kimbell*, 164 Vt. at 85-88, 665 A.2d at 47-49. Courts have also suggested that the government may impose a regulatory fee "to defray the cost of administering legitimate regulation of First Amendment

activity." *Moffett*, 360 F. Supp. at 231-32 (relying on *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941), and *Murdock v. Pennsylvania*, 319 U.S. 105, 116-17 (1943), in striking down $35 fee for lobbying activities because funds from fee were far in excess of sums needed to administer statute's registration provisions).

▮ In the instant case, however, the State does not claim that revenues from the lobby tax are intended to compensate it for administering Vermont's lobbyist disclosure statute. Cf. *Thrifty Rent-A-Car v. City of Denver*, 833 P.2d 852, 855 (Colo. Ct. App. 1992) (transaction fee imposed on car rental company for each airport customer after company received $25,000 in gross monthly revenues was permissible user's fee, not illegal income tax, because it was used to defray expense of operating and improving airport facility). Indeed, § 264a(d) explicitly provides that all revenues collected from the lobby tax "shall be submitted to the state treasurer for deposit in the Vermont campaign fund established under section 2856 of Title 17." Thus, the tax cannot be construed as a regulatory fee, assuming that such a fee would pass constitutional muster. See *Fidanque*, 969 P.2d at 379-80 (holding that lobbyist registration fee violated state constitution, and noting that, whatever might be permissibility of regulatory fee imposed to administer statute, "the statute on its face does not tie the fee to the costs associated with registering lobbyists"); see also *Murdock*, 319 U.S. at 138 (Frankfurter, J., dissenting) ("There is no constitutional difference between a so-called regulatory fee and an imposition for purposes of revenue.").

### B.

Apart from regulatory fees, the Supreme Court has also acknowledged that First Amendment activities are not immunized from "any of the ordinary forms of taxation for support of the government." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936). The Court in *Grosjean* emphasized, however, that a tax singling out interests protected by the First Amendment cannot stand. *Id.* at 244, 250 (it is settled law that freedoms of speech and press "are rights of the same fundamental character" safeguarded against abridgment by state legislation). In making this point, the Court examined the history and circumstances that led to the adoption of the First Amendment's abridgement clause. *Id.* at 244-48. The Court noted that the dominant purpose underlying the British taxes on the press and other modes of communication was to curtail "the acquisition of knowledge by the people in respect of their governmental affairs." *Id.* at 247.

Accordingly, the Court concluded that the abridgment clause prohibited not only laws that directly censored First Amendment interests, but also laws that singled out those interests for special taxation. *Id.* at 248-50 (evil to be prevented by First Amendment was not merely censorship, but rather any government action that might prevent such free and general discussion of public matters as seems absolutely essential to prepare people for intelligent exercise of their rights as citizens).

The United States Supreme Court has consistently adhered to this principle of disallowing special taxes that single out and burden First Amendment interests.[3] For example, in *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 592-93 (1983), the Court struck down, on two independent grounds, a special use tax imposed on paper and ink products consumed in the production of publications. The first ground, the one most relevant to the instant case, was that the tax singled out a First Amendment interest for special treatment. While acknowledging that the government can subject First Amendment interests to "generally applicable" economic regulations without creating constitutional problems, the Court rejected the State's claim that the paper and ink tax was a substitute for the sales tax and thus part of a general scheme of taxation. *Id.* at 581. The Court noted that its previous cases approving such economic regulation "emphasized the *general applicability* of the challenged regulation *to all businesses.*" *Id.* at 583 (emphasis added). The Court reasoned that there is less concern that "a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency." *Id.* at 585. When the tax singles out a select group, however, the political constraint is absent, and "the threat of burdensome taxes becomes acute." *Id.*

■ According to the Court, where First Amendment interests are at stake, heightened scrutiny is required. See *id.* Hence, if a tax singles out and burdens freedoms protected by the First Amendment, the tax

---

[3] The Supreme Court has held, however, that the government is not required to subsidize First Amendment interests through tax-exempt status or tax deductions. See *Regan v. Taxation With Representation*, 461 U.S. 540, 546, 548-50 (1983) (upholding statute creating tax-exempt status that restricted tax-deductible contributions to charitable organizations not involved in lobbying; First Amendment does not require government to subsidize protected activity); *Cammarano v. United States*, 358 U.S. 498, 512-13 (1959) (upholding regulations denying deductions for lobbying expenses; taxpayers are simply being required to pay for their constitutionally protected activities out of their own pocket, as all persons engaged in similar activities are required to do).

is unconstitutional "unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation." *Id.* The Court emphasized that the State's interest in raising revenue, standing alone, could never satisfy this stringent standard because the State could raise revenue by taxing businesses generally, and thereby avoid imposing a special burden on First Amendment interests. *Id.* at 586.

The Court acknowledged the absence of evidence that the special use tax on paper and ink products was the result of any impermissible or censorial motive on the part of the legislature, but nonetheless struck the tax down because it singled out First Amendment interests without a compelling government interest to support it. *Id.* at 580, 586. The Court also rejected as immaterial the State's contention that the special tax was less burdensome than what a straightforward sales tax would have been, holding that special treatment threatens First Amendment interests "not only with the current *differential* treatment, but also with the possibility of subsequent differentially *more burdensome* treatment." *Id.* at 588; see *Moffett*, 360 F. Supp. at 231 (under Supreme Court case law, "a tax on the exercise of First Amendment freedoms is unconstitutional even when there is no proof that the tax actually restrains the exercise of those freedoms").

These principles were reaffirmed in later cases in which the Supreme Court upheld *generally applicable* taxes that burdened First Amendment interests. See *Leathers*, 499 U.S. at 453 ("the State's extension of its generally applicable sales tax to cable services . . . does not violate the First Amendment"); *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 392 (1990) (collection and payment of generally applicable sales and use tax on distribution of religious materials does not violate First Amendment). In *Leathers*, the Court considered the constitutionality of an extension of Arkansas's gross receipts tax to cable, television, and radio services but not the print media. Reviewing its previous cases, the Court noted that a tax on First Amendment interests is "constitutionally suspect" and thus subject to heightened scrutiny when it singles out those interests, targets a small group of speakers, *or* discriminates on the basis of the content of the taxpayer's speech. *Leathers*, 499 U.S. at 447. In upholding the statute under the first criterion, the one most relevant here, the Court stated that the tax in question was one "of general applicability" that applied to "a broad range of services," including telecommunications and utility services, as well as personal services such as furnishing services, repair services, and cleaning

services, among others. *Id.* Thus, the Court concluded that tax did not "single out" the First Amendment interest being burdened. *Id.*

The dissent contends that the lobby tax, like the tax deemed constitutional in *Leathers*, is one "imposed on other types of services, including utility and telecommunications." 172 Vt. at 399, 779 A.2d at 38. Applying this premise, the dissent then cites *Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622, 660 (1994), for the proposition that the First Amendment does not always demand strict scrutiny of regulations that discriminate among media or different speakers within a single medium. See 172 Vt. at 399, 779 A.2d at 38. The problem with this argument is that the premise is wrong. The lobby tax is not a generally applicable tax that merely discriminates between First Amendment speakers. Rather, as explained more fully below, the lobby tax is a special tax that is aimed exclusively at lobbying expenditures and is completely distinct from the generally applicable sales tax, which is expressly applied to utility and telecommunication services. 32 V.S.A. § 9771(5).

We also find unavailing the State's suggestion, accepted by the dissent, that *Leathers* stands for the proposition that a tax burdening First Amendment interests is unconstitutional only if it suppresses the expression of particular ideas or viewpoints. In *Leathers*, the principal issue upon which the Court focused was whether Arkansas's generally applicable gross receipts tax could be imposed on cable and television services while exempting newspapers and magazines. The Court determined that a generally applicable tax would be upheld under these circumstances as long as it did not discriminate on the basis of viewpoint, which would present the danger of suppressing particular ideas. *Id.* at 453. The Court did not suggest, however, that taxes are presumptively valid as long as they do not discriminate based on viewpoint. Indeed, the Supreme Court has never upheld a tax that singled out First Amendment interests, irrespective of whether it suppressed particular viewpoints.

■ In sum, under Supreme Court case law, generally applicable laws burdening First Amendment interests may or may not be subject to heightened scrutiny, but laws that "single out" those interests "are always subject to at least some degree of heightened First Amendment scrutiny." *Turner*, 512 U.S. at 640-41; see *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 496 (1986) ("Where a law is subjected to a colorable First Amendment challenge, the rule of rationality which will sustain legislation against other

constitutional challenges typically does not have the same controlling force.").

## C.

Applying this case law, we conclude that the lobby tax plainly warrants heightened scrutiny, under which it cannot pass constitutional muster. Indeed, it would be difficult to conceive of a more distinct, independent tax singling out a discrete group of First Amendment speakers. An examination of the particulars of the lobby tax belies the State's view that it is merely an extension of the sales tax assessing the financial transactions of a commercial enterprise.

As noted, the revenues generated from the lobby tax are submitted for deposit into the public campaign fund established in 17 V.S.A. § 2856. This suggests that lobbyists, who arguably represent the interests of the principal contributors to political campaigns, were specifically targeted in an effort to redirect, at least in part, some of the available funds of those contributors to a neutral public fund for candidates for the offices of governor and lieutenant governor. We need not delve into the underlying motives behind the tax, however. Notwithstanding the dissent's assertion that there is no basis to invalidate the lobby tax because it is not intended to inhibit freedom of speech and poses no real threat to lobbying activities, see 172 Vt. at 399, 404, 779 A.2d at 39, 42, "legislative intent is not the *sine qua non* of a violation of the First Amendment." *Minneapolis Star*, 460 U.S. at 592. Whatever its underlying purpose, a tax that singles out First Amendment interests "places a heavy burden on the State to justify its action." *Id.* at 592-93.

That is the case here. The lobby tax is triggered by any type of expenditure made by a lobbyist or an employer of a lobbyist that ultimately furthers the employer's efforts to influence legislative or administrative action. See 2 V.S.A. § 264a (tax is imposed on expenditures of lobbyists and employers of lobbyists); 2 V.S.A. § 261(5) ("Expenditure" means any "payment, distribution, loan, advance, deposit or gift of money or anything else of value and includes a contract, promise or agreement, whether or not legally enforceable, to make an expenditure"; expenditure also includes any "sums expended in connection with lobbying, including research, consulting and other lobbying preparation and travel, meals and lodging"); 2 V.S.A. § 261(9) ("Lobby" or "lobbying" means activities, communications with legislators or administrative officials, or solicitation of others "for the purpose of influencing legislative or administrative action"). Thus, not

only is the tax triggered by expenditures connected with political speech, but it is even further specialized by being limited to expenditures aimed at influencing legislative or administrative action in particular, and not municipal action, for example. See *id.* § 261(1), (8) (limiting definition of "Administrative action" and "Legislative action" to activities of statewide administrative officials and legislators). In short, it singles out a component of the lobbying profession directed toward influencing statewide political action.

No other tax in Vermont is even remotely comparable to the lobby tax. Notably, lobbying is the first and only personal or professional service taxed in Vermont. See 32 V.S.A. § 9741(35) (excluding personal service transactions from sales tax, even if tangible goods are transferred, as long as goods are inconsequential and not separately priced). That fact alone distinguishes the lobby tax as one that singles out the communications and activities of lobbyists. Cf. *Brown v. Commonwealth*, 624 A.2d 795, 796 n.3, 797 (Pa. Commw. Ct. 1993) (concluding that Pennsylvania's sales tax on lobbying services sold at retail does not offend First Amendment because tax is imposed on wide variety of services — including credit collection services, secretarial services, pest control services, employment agency services, computer programming services, lawn care services, and storage services — and thus does not single out lobbying for special tax treatment).

But the lobby tax is far more than a tax on lobbying services or sales transactions involving lobbying services. Rather, the broad-based tax reaches all types of expenditures — whether or not they can be deemed sales or services — of both lobbyists *and their employers*, including salaries, meals, lodging, newsletters, loans, gifts, contracts or any other type of expenditure (or agreement to make an expenditure) aimed at influencing legislation or administrative action. Thus, notwithstanding the State's and the dissent's claims to the contrary, the lobby tax is completely distinct, in both form and function, from a sales tax. The taxable event upon which a sales tax is imposed is the sale of a product or perhaps a service. See *Thomas Steel Strip Corp. v. Limbach*, 575 N.E.2d 114, 116 (Ohio 1991). Generally, the seller of goods or services collects a sales tax from the purchaser of those goods or services at the time of the purchase for the benefit of the state. *State Farm Mut. Auto. Ins. Co. v. Berthelot*, 732 So. 2d 1230, 1234-35 (La. 1999).

In contrast, the taxable event for the lobby tax is not a sales transaction, but rather the reporting of a taxable expenditure. The tax

is imposed on the "expenditures" of lobbyists and their employers at the time that they are reported, not at the time that they are made. Further, at least where the paid lobbyist makes unreimbursed expenditures, the provider, not the purchaser or ultimate consumer, of the service pays the tax.[4] See *Apollo Stereo Music Co. v. City of Aurora*, 871 P.2d 1206, 1209 (Colo. 1994) (when tax is imposed directly on business rather than on customers of business, it is more like income tax than sales tax); see also *Cox Cable v. City of New Orleans*, 624 So. 2d 890, 893 (La. 1993) (tax on cable television services has essential characteristics of sales tax because it is paid by the purchaser at time service is purchased, is collected by seller but cannot be assumed by seller, and is calculated by percentage of purchase price of service); *Radiofone, Inc. v. City of New Orleans*, 616 So. 2d 1243, 1247 (La. 1993) (same conclusion with respect to tax on telecommunications services). In short, § 264a taxes certain aspects of the lobbying profession and is triggered, not by a sales transaction, but by the reporting of an expenditure associated with a taxable lobbying activity.

Not surprisingly, the tax on lobbying services is not mentioned anywhere in the statutes dealing with the sales tax, even though, as noted, the sales tax statute explicitly exempts all personal services. See 32 V.S.A. § 9741(35). Further, although the lobby tax necessarily results in an *additional* tax on products that have already been subjected to a sales tax, it is not specifically exempted from Vermont's generally applicable sales tax.[5] Cf. 32 V.S.A. § 9741 (listing sales that are exempt from generally applicable sales tax). Moreover, not only is the trigger for payment of the tax unique, but the tax is paid to the Secretary of State rather than the Commissioner of Taxes. Compare 2 V.S.A. § 264a(b) with 32 V.S.A. §§ 9771, 9776. The lobby tax uses special filing forms requiring different types of information and computation methods from what is required by sales or use tax forms. Unlike sales tax forms, copies of the special lobby tax forms must be filed with legislative counsel.

Because imposition of the lobby tax depends on the purpose behind the expenditures rather than the nature of the transaction itself, it may function like a sales tax at times, but at other times like an income or

---

[4] The tax may ultimately be paid by the lobbyist's employer as part of the fee charged by the lobbyist, but the employer is also paying tax on the fee or salary paid to the lobbyist.

[5] The State contends that there is no need to exempt lobbying services because Vermont law does not have a general statutory provision that taxes services. That acknowledgment only highlights the State's untenable position that the tax on lobbyist services is merely an extension of the generally applicable sales tax.

payroll tax (on lobbyist fees or salaries) or a meals and rooms tax. It is, in fact, a completely unique type of tax triggered exclusively by core political speech concerning the right to petition one's government. Even if the State could make a reasonable argument that the lobby tax is an extension of the sales tax, which it cannot, it most definitely is not a *generally applicable* sales tax of the type that may burden First Amendment interests and still pass constitutional muster. See *Reed v. City of New Orleans*, 593 So. 2d 368, 371 (La. 1992) (sales and use taxes may be general, applying to all goods, or selective, applying to only one specific commodity).

In the face of seemingly irrefutable evidence that § 264a singles out lobbyists and is distinct from a generally applicable sales tax, the State responds that (1) the lobby tax has some similarities to Vermont's sales tax; (2) most of the allegedly unique features of the lobby tax are also present in various other sales taxes imposed on particular goods such as alcohol and tobacco; (3) the remaining unique features of the lobby tax — such as how and when it is collected — do not result from a difference in the function of the tax, but rather from the practical convenience of incorporating the tax into the framework already established in the lobbyist registration and disclosure law for reporting expenditures.

These arguments are not persuasive. First, the differences between the lobby tax and the sales tax far outnumber the relatively few similarities noted by the State, such as § 264a(c)'s adoption of the enforcement provisions contained in chapter 233 of Title 32. Second, while it may be true that some of the atypical features of the lobby tax are shared by particular sales taxes on special items such as alcohol and tobacco, no sales tax contains all, or even most, of the lobby tax's distinctive features. More importantly, merely because a few specially taxed items share one or two atypical features of the lobby tax does not suggest that the lobby tax is a *generally applicable* sales tax burdening "all businesses." *Minneapolis Star*, 460 U.S. at 583. Rather, it demonstrates the contrary. Generally applicable tax statutes are not subjected to heightened scrutiny because "[w]e need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency." *Id.* at 585. Given this rationale, the lobby tax cannot possibly be considered a tax generally applicable to all Vermonters.

Third, the incorporation of the lobby tax into the framework of the lobbyist registration and disclosure statute could just as easily be construed as demonstrating that § 264a is a unique tax on lobbying,

quite apart from any generally applicable sales tax. Indeed, given § 264a's objective of taxing all expenditures ultimately aimed at influencing legislation — whether the expenditure be hiring a lobbyist, inviting a legislator to dinner, renting a room near the Statehouse, or purchasing ballpoint pens — the only possible way to administer the tax is to piggyback it onto the disclosure law. The tax could not be administered as a sales tax because of what is being taxed.

In sum, by statutory definition, the lobby tax is a tax imposed directly on expenditures connected with communications and activities aimed at influencing legislation. The tax is not part of a generally applicable sales tax that applies to a broad range of services, but rather singles out lobbying, a protected First Amendment interest, for special treatment. In fact, the very trigger for the tax is the reporting of expenditures associated with the right to petition the government to redress grievances. As such, heightened scrutiny is warranted. Because the State proffers no government interest apart from the raising of revenue, the tax cannot withstand such scrutiny.

### D.

The State insists that because the lobby tax is not directed at any particular viewpoint, it is content-neutral, and thus entitled to a presumption of validity. See *Hill v. Colorado*, 530 U.S. 703, 719 (2000) (*principal inquiry* in determining content neutrality is whether government has regulated speech because of disagreement with message conveyed); *Turner*, 512 U.S. at 643 (*as general rule*, laws are content-based if they distinguish favored speech from disfavored speech on basis of ideas or views expressed; by contrast, laws are, *in most instances*, content-neutral if they impose burdens on speech without reference to ideas or views expressed). This argument is unavailing.

The Supreme Court has emphasized on several occasions that the First Amendment's hostility to content-based regulations is not limited to restrictions on particular viewpoints, but rather extends to government restrictions on " 'expression because of its message, its ideas, its subject matter, *or* its content.' " (emphasis added). *Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 537 (1980) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)); see *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987) (same); see also *Hill*, 530 U.S. at 723 ("Regulation of the subject matter of messages, though not as obnoxious as viewpoint-based regulation, is also an objectionable form of content-based

regulation."); *Simon & Schuster, Inc. v. New York State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (statute restricting speech about crime is content-based); *Fed. Communications Comm'n v. League of Women Voters*, 468 U.S. 364, 381, 383-84 (1984) (regulation singling out commercial broadcasters and denying them right to address their chosen audience on "controversial issues of public importance" is content-based).[6]

But we need not resolve any perceived inconsistency in Supreme Court case law concerning when a law may be deemed content-neutral. As we emphasized earlier, a special tax that singles out and burdens First Amendment interests, as § 264a does, is subject to heightened scrutiny regardless of whether it is content-neutral. See *Turner*, 512 U.S. at 640-41, 642 (laws that single out First Amendment interests "are always subject to at least some degree of heightened First Amendment scrutiny" — those "regulations that are unrelated to the content of speech are subjected to an intermediate level of scrutiny"). Taken to its logical conclusion, refusing to subject a tax on political speech to heightened scrutiny unless it disfavored particular viewpoints would allow the State to impose a tax so great that it could effectively destroy the right to petition one's government, as long as the tax burdened all viewpoints equally. That is not the law.

## II.

Because our resolution of the instant dispute under the First Amendment is controlling, we need not address whether § 264a violates the Equal Protection Clause of the Fourteenth Amendment.

---

[6] The dissent cites two cases for the proposition that the Supreme Court in *Leathers* was concerned with taxes that discriminate on the basis of viewpoint rather than subject matter. See 172 Vt. at 400-01, 779 A.2d at 39-40. Those cases involved differential treatment among various media with respect to a tax exemption, and thus are inapposite here. See *Arizona Dep't of Revenue v. Great Western Publ'g, Inc.*, 3 P.3d 992, 997-98 (Ariz. Ct. App. 1999); *Magazine Publishers of Am. v. Commonwealth*, 654 A.2d 519, 521-22 (Pa. 1995). As the distinguished commentator cited by the dissent stated:

> [A] law is content based if its application depends on either the subject matter or the viewpoint expressed. Phrased another way, the requirement that the government be content neutral in its regulation of speech means that the government must be both viewpoint neutral and subject-matter neutral. . . . If a law is either a viewpoint or a subject-matter restriction it is deemed to be content based.

E. Chemerinsky, *Content Neutrality as a Central Problem of Freedom of Speech: Problems in the Supreme Court's Application*, 74 S. Cal. L. Rev. 49, 51 (2000).

## III.

Finally, the State argues that the superior court erred in asserting jurisdiction over plaintiffs' claims, except for those of plaintiff Home Builders Association, because those plaintiffs failed to exhaust their administrative remedies by seeking tax refunds before challenging the constitutionality of the lobby tax in the superior court. See 2 V.S.A. § 264a(c) (adopting rights of appeal contained in chapter 233 of Title 32); 32 V.S.A. § 9777(a) (taxpayer may seek hearing before commissioner to challenge assessment of tax); 32 V.S.A. § 9781(a)-(b) (if application is made within three years after payment, commissioner shall refund any tax erroneously, illegally, or unconstitutionally collected; person shall not be entitled to refund determined to be due under § 9777 "where he has had a hearing or an opportunity for a hearing as provided in that section or has failed to avail himself of the remedies therein provided"). The State relies principally upon *Stone v. Errecart*, 165 Vt. 1, 6, 675 A.2d 1322, 1326 (1996), in which this Court stated:

> We hold that 32 V.S.A. § 5887 requires that a taxpayer petition for a refund from the Commissioner pursuant to 32 V.S.A. § 5884 before going to superior court. The failure of the taxpayer to exhaust this administrative remedy deprives the superior court of jurisdiction. This is so even if the petition to the Commissioner is futile because the Commissioner is not empowered to grant the relief requested.

We note that, unlike § 5887(a) ("exclusive remedy" of taxpayer with respect to refund of income taxes "shall be the petition for refund provided under section 5884 of this title" and to appeal therefrom as provided in § 5885), § 9781 does not expressly provide that a hearing under § 9777 is the exclusive remedy for challenging the imposition of a tax. But we need not resolve this question at this time. As a result of the parties' agreement, plaintiff Home Builders Association exhausted its administrative remedies and is a party to this appeal. Thus, our decision today is not advisory. There is no reason to address the jurisdictional issue concerning the plaintiffs other than Home Builders Association unless, and until, those plaintiffs actually request, and are denied, a refund of any taxes paid pursuant to § 264a.

*Affirmed.*

**Dooley, J.,** concurring. Frequently in a 3-to-2 decision of this Court, a justice finds force in both competing arguments and is ultimately persuaded to join one side or the other on relatively narrow considerations. This is such a case. Like the dissent, I am not particularly persuaded by the form of this tax or the fact that it is placed in Title 2 and paid to the Secretary of State or that the revenue goes to a special campaign fund. I would probably uphold a sales tax on the personal services of lobbyists, whatever its form. What persuades me is that the tax involved in this challenge cannot fairly be called either a sales or use tax, a point made by the majority and largely ignored by the dissent. The substance, not the form, of the tax makes it invalid.

Vermont's sales and use tax law defines both sale and use. A sale is a "transfer of title or possession or both, exchange or barter, rental, lease or license to use or consume, conditional or otherwise, in any manner or by any means whatsoever for a consideration, or any agreement therefor." 32 V.S.A. § 9701(6). The definition does not include sales of services, even if some tangible personal property is transferred in the process. 32 V.S.A. § 9741(35). Use is "the exercise of any right or power over tangible personal property by the purchaser thereof." 32 V.S.A. § 9701(13). If the *substance* of the lobby tax merely removed the exception for services with respect only to lobbyist services, the State's characterization of the tax as just an extension of the sales tax would be valid. Similarly, if the *substance* of the tax merely expanded the definition of use to include consumption of services to compensate for instances when the sales tax did not reach them, again the State's position would be defensible.

But, in my judgment, the dissent is in error in its central description of the nature of the tax:

> First and foremost, the tax on lobbying expenditures indisputably functions like a sales tax, by taxing a sales transaction. Every commercial transaction involves an expenditure and a sale, depending on one's perspective. The tax on expenditures is no different from a tax on sales; there is only one transaction, and it is generally the purchaser who pays the tax.

172 Vt. at 397, 779 A.2d at 37. As the dissent states in the quoted passage, the tax before us is one on "expenditures," not sales or uses. It is a tax on expenditures of both lobbyists and employers of lobbyists. Of course, sales necessarily produce expenditures, even if by exchange

or barter, as described in the statutory definition set out above. Expenditures are not necessarily based on sales, however.

The most obvious example is when an employer of a lobbyist directly makes a gift to a legislator. That is clearly a taxable expenditure, but it is neither a sale nor a use. A quick perusal of the website of the Secretary of State shows that many of the taxable expenditures of an employer of a lobbyist are neither sales nor services. For example, if a trade association, which employs a staff lobbyist and mails a newsletter to its members, adds legislators or administrative officials to its mailing list, the costs of the newsletter attributable to discussion of policy issues before the legislative or executive branch is a taxable lobbyist employer expenditure even if the newsletter is produced solely in-house. *Lobbying FAQs: What Constitutes Lobbying?*, Vermont Secretary of State's Home Page, at *http://www.sec.state.vt. us/pubs/lobby/lobfaq1.htm* (last visited Apr. 27, 2001). Indeed, the Secretary of State has opined that inviting legislators to view the Vermont Yankee Nuclear Power Plant for general background information would make any expenses in connection with the trip taxable if Vermont Yankee also employed a lobbyist. *Id.* at *http://www.sec.state. vt.us/pubs/lobby/lobfaq7.htm* (last visited Apr. 27, 2001).

As the majority points out, a tax imposed based on the purpose of an expenditure necessarily crosses all the lines contained in traditional tax categories. For example, advertising services generally remain untaxed, but advertising services intended to influence legislation or administrative rulemaking are taxed if sold to an employer of a lobbyist.

For this reason, much of the tax base defined in 2 V.S.A. § 264a(a) will be salaries paid to company or association staff who lobby as part of their jobs. I acknowledge that employees in such circumstances could be said to be selling their services for compensation. This is, however, a large expansion of any concept of sales of services in the current law. The result is a payroll tax on employers on that part of the payroll attributable to lobbying, including presumably a share of the salary of corporate officers and managers whose jobs necessarily include seeking favorable governmental action. I do not think that a broad payroll tax can be fairly viewed as a sales or use tax.

Finally, I note that the repetitive taxation of the same event by this tax is unparalleled in our sales tax. If a lobbyist buys a pen to use in lobbying, the lobbyist pays a sales tax on the purchase. The lobbyist then pays a lobbyist's expenditure tax on the same pen purchase. The lobbyist then bills the client for the lobbyist's expenditures, including

the cost of the pen, and the lobbyist's employer pays an additional, third tax on the cost of the same pen. I recognize that double taxation may be unavoidable once a state taxes the sale of services, but triple taxation of the same purchase goes well beyond anything in our sales tax, even broadly defined.

In short, the tax before us is a tax on lobbying and not merely a tax on the services of lobbyists, as it is often described. It will capture some sales of services, but it will capture a lot more than that. It has no analog in our state tax scheme. As explained by the majority, this unique tax on lobbying clearly transcends the lines drawn by the United States Supreme Court in *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983), and *Leathers v. Medlock*, 499 U.S. 439 (1991).

**Morse, J.,** dissenting. The Court today invalidates a state sales tax on the ground that it impermissibly singles out a class of speakers, lobbyists, in violation of the First Amendment. Although I agree that lobbyists — as a profession specializing in "petition[ing] the Government" — are entitled to First Amendment protection, I do not share the Court's view that the tax impermissibly discriminates against them. U.S. Const. Amend. I. At its core, the lobbyist-expenditure tax functions as a content-neutral extension of Vermont's general sales tax, and therefore presents no First Amendment violation. I respectfully dissent.

The principal basis of the Court's decision is its conclusion that the lobbyist expenditure tax singles out lobbyists and lobbyist-employers for disparate tax treatment. The Court relies upon principles developed in a series of United States Supreme Court decisions dealing with First Amendment challenges to taxes on various segments of the media. In fact, these cases may be interpreted to demonstrate that the tax on lobbyist expenditures is constitutionally inoffensive.

The most recent decision on point is *Leathers v. Medlock*, 499 U.S. 439 (1991). There, cable television operators argued that an Arkansas statute extending the general sales tax to cable services, while maintaining existing exemptions for newspapers and magazines, violated the First Amendment. After reviewing a number of earlier decisions, the Supreme Court reaffirmed the general principle that "differential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints." *Id.* at 447. The high court then identified three circumstances where this threat may be inferred and the law justified

only by a compelling governmental interest: (1) when the tax is so structured as to single out the press for differential tax treatment; (2) when the tax targets a small group of First Amendment speakers; and (3) when the tax is based upon the viewpoint or ideas of the speakers. See *id.* Applying that test to the Arkansas statute, the Supreme Court concluded that it was an extension of the state's generally applicable sales tax, did not impermissibly target a small group of speakers, and was content neutral. Accordingly, the tax was not subject to heightened judicial review.

*Leathers*, unfortunately, provided little practical guidance or principled framework through which to judge the validity of other taxing or regulatory schemes, such as that presented here, and subsequent case law, while suggestive, has not substantially advanced the analysis. See, e.g., *Department of Revenue v. Magazine Publishers of Am.*, 604 So. 2d 459, 461-62 (Fla. 1992) (on remand for reconsideration in light of *Leathers*, court held that tax on retail sales of secular magazines did not single out press for special tax treatment, but unconstitutionally discriminated on basis of content); *Magazine Publishers of Am. v. Commonwealth*, 654 A.2d 519, 523 (Pa. 1995) (statute deleting sales and use tax exemption for magazines but retaining exemption for newspapers did not constitute prohibited special tax); *Cox Cable Hampton Roads, Inc. v. City of Norfolk*, 410 S.E.2d 652, 655 (Va. 1991) (municipal utility tax on cable television service was generally applicable tax, notwithstanding fact that it applied to only one company).

More instructive by far is the principal case on which *Leathers* relied in developing the "singling out" rule, *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983). For a number of years, Minnesota's sales and use tax had exempted retail sales of periodicals. Like most such schemes, the use tax augmented the sales tax by eliminating any tax incentive for Minnesota residents to acquire goods in other states in order to avoid the sales tax. See *id.* at 577. In 1971, the use tax component was amended to impose a tax on the cost of paper and ink products consumed in producing a publication. Thus, as the Supreme Court noted, "[i]nk and paper used in publications became the only items subject to the use tax that were components of goods to be sold at retail." *Id.* at 578. In 1974, the legislature amended the statute again to exempt the first $100,000 worth of ink and paper consumed by a publication in any calendar year. The result was that only eleven publishers in the state, including the plaintiff, incurred a tax liability in 1974.

The Supreme Court invalidated both the underlying paper and ink tax and the tax as amended to exempt the first $100,000 in costs. The Court's rationale was two-fold. First, it noted that the paper and ink tax was a "special tax that applie[d] only to certain publications protected by the First Amendment." *Id.* at 581. Although a use tax ordinarily serves to complement a sales tax by eliminating the incentive to make major purchases out of state, the use tax on paper and ink served no such function. It "applie[d] to all uses, whether or not the taxpayer purchased the ink and paper in-state, and it applie[d] to items exempt from the sales tax," although in general items exempt from the Minnesota sales tax were not subject to a use tax. *Id.* at 582. Thus, the Court observed, "[b]y creating this special use tax, which, to our knowledge, is without parallel in the State's tax scheme, Minnesota has singled out the press for special treatment." *Id.* Such differential treatment, the Court concluded, "suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional." *Id.* at 585.

In addition, the Court concluded that the paper and ink tax violated the First Amendment "not only because it singles out the press, but also because it targets a small group of newspapers." *Id.* at 591. The effect of the $100,000 exemption was that only a handful of publishers paid any tax, and the Court held that a tax so tailored "that it singles out a few members of the press presents such a potential for abuse that no interest suggested by Minnesota can justify the scheme." *Id.* at 592.

As commentators have noted, the rule in *Minneapolis Star* — and by extension in *Leathers*, which expressly cited and relied on *Minneapolis Star* — is that the Supreme Court will infer a censorial purpose, even in the absence of evidence of such a purpose — where the challenged tax differs so substantially in form or function from other state taxes that it can be said to single out the media for discriminatory treatment. See R. Bezanson, *Political Agnosticism, Editorial Freedom, and Government Neutrality Toward the Press: Observations on Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 72 Iowa L. Rev. 1359, 1369 (1987) ("the [Minnesota] tax was differential because its *form* was different"); Note, *Leathers v. Medlock: The Supreme Court Changes Course on Taxing the Press*, 49 Wash. & Lee L. Rev. 1053, 1072 (1992) (the *Leathers* test looks to "the structure of the tax" to see if it violates the prohibition on censorship). "The conclusive weight placed on form," one author has observed,

serves a core value of the First Amendment by ensuring government neutrality toward the press. Bezanson, *supra*, at 1369-70.

Assessed in light of these principles — and contrary to this Court's conclusion — the lobbying expenditure tax is *not* so different in form or function from Vermont's general sales tax that it requires heightened judicial review. First and foremost, the tax on lobbying expenditures indisputably functions like a sales tax, by taxing a sales transaction. Every commercial transaction involves an expenditure and a sale, depending on one's perspective. The tax on expenditures is no different from a tax on sales; there is only one transaction, and it is generally the purchaser who pays the tax. See 32 V.S.A. § 9778.

The Court also asserts that the lobbyist-expenditure tax differs from the general sales tax because it was incorporated into the framework of the lobbyist registration and disclosure statute. The fact that the Legislature borrowed the terminology and provisions of an existing regulatory scheme requiring disclosure and reporting of lobbying "expenditures," 2 V.S.A. § 264, does not alter the essential *form* of the tax. Indeed, unlike the tax in *Minneapolis Star*, which the Supreme Court noted was "without parallel" in Minnesota's taxing scheme, 460 U.S. at 582, the tax on lobbying expenditures is essentially nothing more than an extension of the existing Vermont sales tax to an additional service provider. In this regard, it is also noteworthy that the Legislature imposed the identical tax rate (five percent) on lobbying expenditures as that imposed under the general sales tax, and expressly incorporated into the lobbying tax the general sales tax provisions relating to collection, enforcement, penalties, and appeal. See 2 V.S.A. § 264a(a), (c).

The Court identifies other formal distinctions between the general sales tax and the tax on lobbying expenditures. Upon examination, however, none appears to be significant. For example, the tax on lobbying expenditures is codified in a different statutory provision from the general sales tax. Yet, the same is true of other sales taxes, including those applicable to motor vehicles, 32 V.S.A. § 8903, rooms and meals, *id.* § 9241, malt beverages and spiritous liquors, 7 V.S.A. §§ 421, 422, and fuel, 23 V.S.A. §§ 3003, 3106.

The Court also notes that each of the aforementioned taxes is expressly exempt from the state's generally applicable sales tax. See 32 V.S.A. § 9741. This is hardly surprising, however, since an exemption is necessary to prevent sales of items such as fuel or alcoholic beverages from falling within the general sales tax on property sold at retail. The absence of a broad-based sales tax on

services renders such an exemption for the tax on lobbying expenditures unnecessary.

Additionally, the Court observes that sales taxes are generally paid to the Department of Taxes, while the tax on lobbying expenditures is paid to the Secretary of State for deposit into a special campaign fund. Again, the point is hardly compelling, as numerous other sales taxes are paid into special funds. See, e.g., 23 V.S.A. §§ 3015(7), 3106(d) (portion of fuel tax paid into Petroleum Cleanup Fund and wildlife fund); 32 V.S.A. § 8912 (sales and use tax on motor vehicles paid into Transportation Fund); see also *Magazine Publishers*, 654 A.2d at 524-25 (court rejected claim that Pennsylvania sales tax singled out press for special tax treatment because revenues from sales tax on magazines were paid into special Public Transportation Assistance Fund).

The Court notes further that the forms and payment schedule for the lobbyist-expenditure tax differ from the general sales tax. There is no uniform schedule for the payment of sales taxes to the state; some, like the tax on lobbying expenditures, have specific schedules. See, e.g., 23 V.S.A. § 3108 (fuel tax due on 25th of month); 32 V.S.A. § 9243 (rooms and meals tax due monthly or quarterly). The requirement of forms specific to the product or service taxed is also not uncommon. See, e.g., 7 V.S.A. § 421(c) (forms for reporting alcoholic beverage sales volume).

The Court also notes that the lobbying-expenditure tax may result in some double taxation. The acquisition of office materials, for example, may be subject to the general sales tax upon purchase, and later form a component of lobbying expenditures subject to taxation. Again, however, this does not render the lobbyist-expenditure tax *structurally* distinct from the sales tax. Indeed, as the State correctly points out, some double taxation is inevitable when the general sales tax is extended to a "service." Thus, "telecommunications service" is subject to the Vermont sales tax, 32 V.S.A. § 9771(5), although the provider may also pay a sales tax on the purchase of components, such as office supplies, used in providing the service.

Finally, the Court relies heavily on the fact that, apart from the lobbyist-expenditure tax, the general sales tax does not extend to any other "personal or professional" service. 172 Vt. at 386, 779 A.2d at 29. The Court's reliance, once again, is misplaced. That the Legislature chose to extend the sales tax to lobbying but not other personal or professional services does not demonstrate that it is *functionally* different from the general sales tax. As the Supreme Court in *Leathers*

observed, "[i]nherent in the power to tax is the power to discriminate in taxation." 499 U.S. at 451. Thus, *Leathers* upheld a sales tax on cable television services, notwithstanding the fact that no other segment of the media, including newspapers, magazines, and satellite broadcast television, was subject to the tax at that time. There, as here, the tax was imposed on other types of services, including utility and telecommunications, see *id.* at 447, but the mere fact that it was not imposed on any *similar* media services did not differentiate it in any constitutionally significant way.

This point was brought home by the Supreme Court in its subsequent decision in *Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622 (1994). There, in rejecting a claim that certain regulations applicable only to cable television triggered strict scrutiny review, the Court observed:

> It would be error to conclude, however, that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others. In *Leathers v. Medlock*, 499 U.S. 439 (1991), for example, we upheld against First Amendment challenge the application of a general state tax to cable television services, even though the print media and scrambled satellite broadcast television services were exempted from taxation. As *Leathers* illustrates, the fact that a law singles out a certain medium, or even the press as a whole, "is insufficient by itself to raise First Amendment concerns." *Id.* at 452.

*Id.* at 660.

The Court's holding ultimately suggests that the easy constitutional "fix" is simply to conform certain procedural externalities of the lobbyist-expenditure tax to the general sales tax. The legal web spun by the Legislature was functionally suitable; it simply lacked a certain purity of design. When all is said and done, what matters apparently is not the Legislature's straightforward intent to capture additional revenue through a generally applicable lobbyist-expenditure tax; nor the virtual absence of any evidence of a legislative intent to inhibit plaintiffs' freedom to speak and petition the government; nor even the existence of similar sales taxes on other services involving expression, such as telecommunications and printing. What matters is form, or appearance, and that — as this case vividly illustrates — is plainly in the eye of the beholder.

The concurring opinion implies that the tax on lobbying expenditures constitutes a rare exception to the general sales tax on tangible personal property rather than services. In fact, Vermont's general sales tax applies to utility services, fabricating and printing services, amusements, and telecommunication services. See 32 V.S.A. § 9771(2)-(5). The concurring opinion also suggests that the lobbyist tax fails because expenditures may include more than sales. The argument, which plaintiffs did not raise, is hardly dispositive, as most expenditures are sales, and any other taxable transaction may be treated as the equivalent. Although the concurring opinion characterizes this as a difference in "substance," I am not persuaded that it is anything more than a minor difference in form.

Thus, the tax on lobbying expenditures does not represent a "special tax" requiring heightened constitutional review. Because it concluded otherwise, the trial court failed to address the two remaining criteria for strict scrutiny identified in *Leathers*: whether the tax targets a small group of speakers, and whether it discriminates on the basis of the speaker's viewpoint. As explained below, the lobbyist-expenditure tax does not offend either of these additional criteria.

In focusing on the number of speakers subject to the challenged tax, the *Leathers* Court cited *Minneapolis Star*, which involved fewer than a dozen newspapers subject to the tax, and *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229 (1987), where the Court invalidated a sales tax scheme that taxed two or three magazines of general circulation and exempted all trade, sports and professional journals. By way of contrast, the tax in *Leathers* affected approximately 100 cable companies, and the Court concluded that the extension of the Arkansas sales tax "hardly resembles a 'penalty for a few.'" 499 U.S. at 448 (quoting *Minneapolis Star*, 460 U.S. at 592). Here, similarly, the tax on lobbying expenditures, which resulted in tax payments in 1998 by approximately 213 employers of lobbyists, or sixty percent of the total number of registered lobbyist employers, cannot be said to target an impermissibly small number of speakers.

Nor does the tax on lobbying expenditures require strict scrutiny on the basis of "viewpoint" discrimination. As noted, *Leathers* held that a tax will trigger heightened review under the First Amendment "if it discriminates on the basis of the content of taxpayer speech." 499 U.S. at 447. Although *Leathers* did not specifically define what it meant by "content" discrimination, several courts and commentators have concluded that the Court was concerned with taxes that discriminate

on the basis of ideas or viewpoint, not on the basis of subject matter. See, e.g., *Arizona Dep't of Revenue v. Great Western Publishing, Inc.,* 3 P.3d 992, 997 (Ariz. Ct. App. 1999) (rejecting argument that *Leathers* broadly prohibited any tax discriminating among publications on basis of content, concluding instead that "[g]enuine 'content-based' discrimination" must be based on "particular ideas or viewpoints"); *Magazine Publishers,* 654 A.2d at 523 (rejecting magazine trade group's claim that newspaper exemption from general sales tax discriminated on basis of "content" merely because it required reference to definition of newspaper as publication "containing matters of general interest and reports of current events"); Note, *supra,* at 1062 n.58 ("Justice O'Connor in *Leathers* expresses concern about censorship which implies viewpoint distinctions."). But cf. *Department of Revenue,* 604 So. 2d at 461-62 (invalidating sales tax scheme that subjected magazines to sales tax but exempted newspapers on ground that statute required tax department to evaluate contents of publication to determine whether it was entitled to exemption).

The distinction is important, for the Court has defined content-based classifications in a variety of ways, and not always consistently. See E. Chemerinsky, *Content Neutrality as a Central Problem of Freedom of Speech: Problems in the Supreme Court's Application,* 74 S. Cal. L. Rev. 49, 51 (2000) (noting distinction between "viewpoint-neutral" standard, which prohibits regulations that discriminate on basis of "the ideology of the message," and "subject-matter-neutral" requirement, which prohibits laws "based on the topic of the speech"); G. Stone, *Restrictions of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions,* 46 U. Chi. L. Rev. 81, 83-84 (1978) (providing general background on content-based classifications and discussion of standards of content review). Subject-matter restrictions have been upheld in some contexts. See, e.g., *Burson v. Freeman,* 504 U.S. 191, 211 (1992) (upholding restriction on campaigning activity near polling places); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 302-04 (1974) (upholding ordinance prohibiting political advertisements on buses, while permitting commercial advertisements). Viewpoint restrictions are invariably invalidated, as they pose "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *Turner,* 512 U.S. at 641.

Justice O'Connor, writing for the majority in *Leathers,* repeatedly expressed the Court's concern with taxes that discriminate on the basis of the targeted speaker's *ideas* or *views.* That concern was

expressed in a variety of ways throughout the opinion, as follows: "[D]ifferential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints," 499 U.S. at 447; "a tax on a small number of speakers runs the risk of affecting only a limited range of views," *id.* at 448; "[t]his is not a tax structure that resembles a penalty for particular speakers or particular ideas." *Id.* at 449. We thus agree with those authorities who have concluded — as one author has written — that "[t]he *Leathers* Court . . . focused on viewpoint-based and idea-based discrimination instead of distinctions of form, frequency, or even subject-matter." Note, *supra*, at 1080.

It has not gone unnoticed that the Supreme Court's emphasis in *Leathers* on viewpoint discrimination marked a subtle but nonetheless distinct departure from language in earlier decisions, notably *Ragland*, which had invalidated a sales tax because it exempted certain periodicals based on their subject matter. See *Ragland*, 481 U.S. at 229. In *Leathers*, however, the Court "underwent a shift . . . in viewing the First Amendment as more concerned with viewpoint censorship and less with mere content distinction." Note, *supra*, at 1060 n.49. This emphasis on viewpoint discrimination is particularly noticeable in the Court's subsequent decision in *Turner*. There, in rejecting a challenge by cable television operators to FCC requirements that they carry local broadcast stations, the Court observed:

> We have said that the "principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.". . .

> As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based. . . . By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral.

*Turner*, 512 U.S. at 642-43 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Thus understood, the tax on lobbying expenditures is content-neutral within the meaning of *Leathers*. Although the tax applies to expenditures related to a particular subject, i.e., lobbying for the purpose of influencing legislative or administrative action, see 2 V.S.A.

§ 261(9)(A), it draws no distinctions on the basis of the viewpoint or ideas to which such activities are directed. As the court in *Brown* observed, upholding Pennsylvania's extension of the sales tax to lobbyists' services, "[t]he tax applies to all lobbyists who sell their services at retail without regard to the ideas or the content of the speech advanced by any particular lobbyist." *Brown v. Commonwealth*, 624 A.2d 795, 797-98 (Pa. Commw. Ct. 1993); see also *Kimbell v. Hooper*, 164 Vt. 80, 82, 665 A.2d 44, 45-46 (1995) (observing that nothing in lobbying disclosure act "attempts to censor particular messages or points of view").

In sum, the tax on lobbying expenditures does not meet any of the criteria identified by the Supreme Court as requiring application of the most demanding level of constitutional scrutiny. Absent such constitutional concerns, the question turns solely on whether the lobbyist expenditure tax is rationally related to a legitimate governmental purpose. See *Regan v. Taxation With Representation*, 461 U.S. 540, 549-51 (1983).

Most assuredly the state's purpose in enacting the tax on lobbying expenditures was to raise revenue to partially fund the Vermont campaign fund. See 2 V.S.A. § 264a(d); 17 V.S.A. § 2856. Raising revenue is a legitimate, if not indeed the principal, purpose of tax legislation. See *In re Property of One Church Street*, 152 Vt. 260, 267, 565 A.2d 1349, 1352 (1989); see also *Quarty v. United States*, 170 F.3d 961, 967 (9th Cir. 1999) ("There can be no dispute that the purpose of raising government revenue is a legitimate legislative purpose."); *Blue Cross & Blue Shield v. State*, 779 P.2d 634, 640 (Utah 1989) (in upholding tax on insurer against equal protection claim, court observed that "[t]he first and predominant purpose of the premium income tax is to raise revenue . . . This is a legitimate purpose."). In accomplishing this purpose, the Legislature is generally free to tax some groups and not others so long as the classification rests upon a reasonable basis. See *General Motors Corp. v. Tracy*, 519 U.S. 278, 311 (1997) (in taxation, more than any other field, legislatures possess greatest freedom of classification); *Regan*, 461 U.S. at 547 ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes."); *One Church Street*, 152 Vt. at 265, 565 A.2d at 1351 (in upholding provision for higher taxes on nonresidential property than residential property, Court noted that Vermont Constitution does not "forbid reasonable classifications of property for tax purposes"). Such statutes are presumptively constitutional, and the burden rests upon the party challenging the tax

to demonstrate that the classification is invalid. See *id.* at 270, 565 A.2d at 1354.

The trial court here concluded that the tax on lobbying expenditures violated equal protection by discriminating between organizations and persons that spend money on lobbying and those who lobby without incurring expenditures. The Legislature nevertheless enjoys broad discretion in creating classifications and distinctions in tax statutes. See *Regan*, 461 U.S. at 547. Thus, it was within the Legislature's prerogative to distinguish for tax purposes a *commercial* transaction — the expenditure of funds related to lobbying activities — from non-commercial lobbying activity.

The trial court also concluded that the statute impermissibly taxed the class of lobbyists and lobbyist employers who expend funds to influence legislative or administrative action, while omitting others, such as newspapers and magazines, who expend funds for similar purposes. Again, however, the classification was not unreasonable. The state has broad latitude in choosing to tax different trades and professions, see *Allied Stores v. Bowers*, 358 U.S. 522, 526-27 (1959), and a tax scheme, such as that presented here, does not unconstitutionally discriminate "unless it discriminates on the basis of ideas." *Leathers*, 499 U.S. at 450. As noted earlier, the tax is content neutral, applying to all lobbying expenditures regardless of the viewpoint expressed or represented.

Here — as in *Leathers* — the Legislature has chosen to include a particular class of speakers within the general sales tax. As was also true in *Leathers*, "[n]othing about that choice has ever suggested an interest in censoring the expressive activities" of those subject to the tax. *Id.* at 453. Indeed, nothing in the record demonstrates that the five percent sales tax poses any real threat — express or implied — to plaintiffs' lobbying activities or freedom of expression. Absent such constitutional concerns, there is no basis to invalidate the tax. I would reverse.

I am authorized to say that Judge Cheever joins in this dissent.